

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **In re** | : **Chapter 11** |
| | : |
| **APPLIANCE CONTROLS GROUP,** | : **Jointly Administered** |
| **HOLDINGS, INC. and APPLIANCE** | : |
| **CONTROLS GROUP, INC.,** | : **Case No. 04-14517** |
| | : **Hon. A. Benjamin Goldgar** |
| | : |
| **Debtors.** | : |

---

## INTERIM ORDER AUTHORIZING THE DEBTORS TO ENTER INTO POSTPETITION FINANCING AGREEMENT AND OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, AND 364 OF THE BANKRUPTCY CODE, GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS, AND SETTING A FINAL HEARING

Appliance Controls Group, Inc. ("ACG") and Appliance Controls Group Holdings, Inc.

("Holdings"), as debtors and debtors-in-possession herein (each a "Debtor" and collectively, the

"Debtors"), having moved on May 5, 2004 (the "Motion") for an order authorizing them to incur

post-petition secured indebtedness, to grant security interests and superpriority claims pursuant

to sections 105(a) and 364 of title 11 of the United States Code (the "Bankruptcy Code") and

Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), and having sought the following relief:

(a)     the Court's authorization, pursuant to sections 105(a) and 364(c) and (d) of the

Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014, for ACG, as Borrower

(individually and collectively, jointly and severally, the "Borrower"), and Holdings and certain

other subsidiaries and affiliates, as Guarantors for the Borrower, to obtain from Hilco Capital, LP

("Hilco"), as collateral agent and administrative agent (each an "Agent" and, collectively, the

"Agents") acting for themselves, as lenders, and as Agents for Fortress Credit Corp. (by itself or

together with one or more of its affiliates "Fortress") and other lenders that may, on the effective

date of this order, and from time to time thereafter become lenders (Hilco and Fortress in their

capacity as lenders, together with such other lenders and the Agents, collectively, the "DIP

Lenders"), cash advances, and other extensions of credit consisting of (a) a revolving A credit

facility in an aggregate principal amount not to exceed $8,000,000 at any time outstanding,

subject to borrowing base limitations, (b) a revolving B credit facility in an aggregate principal

amount not to exceed $1,000,000 at any time outstanding, and (c) a term loan facility in the

aggregate principal amount not to exceed $5,600,000 (which loans and advances shall be limited

to $13,500,000 until the Final Bankruptcy Court Order (as hereinafter defined) shall have been

entered by the Bankruptcy Court), as provided in the DIP Loan Documents (the loans under such

facilities, the "DIP Loans"), pursuant to a Post-Petition Loan and Security Agreement

substantially in the form annexed hereto as Exhibit "A", and as amended, modified or

supplemented from time to time, the "DIP Loan Agreement",[1] by and among the Debtors, the

DIP Lenders and the Agents. The proceeds of the DIP Loans made under the credit facilities

shall be used (i) to refinance all (A) existing pre-petition Obligations of the Borrower, Holdings,

and their direct and indirect subsidiaries under the (1) Pre-Petition Revolving Loan Agreement

and (2) the Pre-Petition Term Loan Agreement (collectively, the "Pre-Petition Obligations") and

(B) existing post-petition Obligations under the Original DIP Order, after the entry of this

Interim Order, (ii) for general working capital requirements and other general corporate purposes

of the Borrower, Holdings, and their direct and indirect subsidiaries during their chapter 11 cases

---

[1]    Unless otherwise defined herein, capitalized terms shall have the meanings as defined in the

(the "Chapter 11 Cases"), (iii) to pay fees and expenses related to the DIP Loan Agreement, (iv)
to pay the fees, costs, expenses, and disbursements of professionals retained by the Debtors or
any statutory committees appointed in the Chapter 11 Cases pursuant to section 1102 of the
Bankruptcy Code (the "Committees"), (v) to pay the costs and expenses of members of the any
committees as approved by the Court, to pay other bankruptcy related charges all as allowed by
the Court, including UST/Clerk Fees (defined herein) subject to the terms of this Interim Order,
and (vi) and to pay any fees, deposits and expenses (including, without limitation, reasonable
attorneys' fees and expenses) owed to the DIP Lenders or the Agents, or otherwise required,
under the DIP Loan Agreement and the other agreements, instruments and other documents
executed in connection therewith (collectively, with the DIP Loan Agreement, the "DIP Loan
Documents");

(b)    the Court's ordering, pursuant to sections 364(c)(1) and (2) and 364(d)(1) of the
Bankruptcy Code, that the Obligations of the Debtors under the DIP Loan Documents
(collectively, the "DIP Obligations") are:

    i.    granted superpriority administrative expense claim status, having priority over any and all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(b), 507, 546(c), 726 and 1114, but subject to (x) any claims under section 506(c) of the Bankruptcy Code, (y) during the occurrence and continuance of an Event of Default or a default hereunder, the payment of Priority Professional Expenses up to the Carve-Out Amount (defined below) and (z) UST/Clerk Fees (defined below);

    ii.    secured under section 364(c)(2) by a first priority, perfected lien on and security interest in all pre-petition and post-petition property of the Debtors, of whatever kind or nature, whether existing on the Filing Date or thereafter acquired, that, on or as of the Filing Date, is not subject to valid, perfected and non-avoidable Liens or to valid and non-avoidable Liens in existence immediately prior to the Filing Date that are perfected subsequent to the Filing Date as permitted by Section 546(b) of the

DIP Loan Agreement.

Bankruptcy Code, including, without limitation, by way of general description only, all property of the "estate" (within the meaning of the Bankruptcy Code), and all accounts, inventory, goods, contract rights, instruments, documents, chattel paper, general intangibles, payment intangibles, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property, fixtures, leases, 100% of the capital Stock or other equity interests in any Subsidiary, money, investment property, deposit accounts, all commercial tort claims and all causes of action arising under the Bankruptcy Code or otherwise (excluding all Avoidance Actions, except to the extent provided in the Final Bankruptcy Court Order), and all cash and non-cash proceeds, rents, products and profits of any of the foregoing (collectively, the "Unencumbered Collateral"), subject only to (a) any Permitted Priority Liens, (b) during the occurrence and continuance of an Event of Default or a default hereunder, the payment of Priority Professional Expenses up to the Carve-Out Amount and (c) UST/Clerk Fees;

iii.    secured under section 364(d)(1) of the Bankruptcy Code by a first priority, perfected lien on and security interest in all pre-petition and post-petition property of the Debtors (but excluding the property described in clause (ii) as to which the liens and security interests in favor of the DIP Lenders and the Agents will be as described in such clause), whether now existing or hereafter acquired, that is subject to valid, perfected and non-avoidable Liens in existence immediately prior to the Filing Date or to valid and non-avoidable Liens in existence immediately prior to the Filing Date that are perfected subsequent to the Filing Date as permitted by Section 546(b) of the Bankruptcy Code (collectively, the "Secured Collateral" and, together with the Unencumbered Collateral, the "Collateral"), subject only to (a) any Permitted Priority Liens, (b) during the occurrence and continuance of an Event of Default or a default hereunder, the payment of Priority Professional Expenses up to the Carve-Out Amount and (c) UST/Clerk Fees

(c)    the Court's ordering, pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") be held to consider entry of an interim order (this "Interim Order") approving on an interim basis the post-petition financing pursuant to the DIP Loan Documents and authorizing the Debtors to obtain, on an interim basis, DIP Loans thereunder consisting of a revolving credit and term loan facilities in an aggregate principal amount not to exceed $13,500,000, subject to borrowing base limitations set forth in the DIP Loan Documents, for the purposes stated above; and

(d)    finding, pursuant to Bankruptcy Rule 4001(c)(1), that notice of the Interim Hearing has been given to (i) the Office of the United States Trustee for the Northern District of Illinois; (ii) the United States Securities and Exchange Commission; (iii) the consolidated thirty (30) largest creditors of the Debtors; (iv) the District Director of Internal Revenue for the Northern District of Illinois; and (v) the United States Attorney for the Northern District of Illinois (collectively, the "Notice Parties") and the Debtors have represented to the Court that such notice was, in the Debtors' belief, the best available under the circumstances; and based upon all of the pleadings filed with the Court, the evidence presented at the Hearing and the entire record herein; and the Court having noted the appearances of all parties in interest; and all objections to the relief requested in the Motion having been resolved or overruled by the Court, and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates and creditors, and is essential for the continued operations of the Debtors' businesses; and it further appearing that the Debtors are unable to obtain unsecured credit for money borrowed allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code or other secured financing on equal or more favorable terms than those set forth in the DIP Loan Documents;

Based upon the above findings, the Court, having reviewed the Motion, considering the arguments of counsel, and otherwise being fully advised, hereby Concludes and Orders as follows:

**IT IS HEREBY ORDERED:** [2]

1.    <u>Disposition</u>. The Motion is granted in on an interim basis. Any objections to the Motion that have not previously been withdrawn are hereby overruled. This Interim Order shall

---

[2]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

be valid, binding on all parties in interest and fully effective immediately upon entry. The term

of this Interim Order and the DIP Loan Documents authorized hereunder shall expire, and the

DIP Loans made pursuant to the DIP Loan Agreement and this Interim Order will mature and,

together with all interest thereon and the other DIP Obligations, become due and payable

(unless such DIP Loans and other DIP Obligations become due and payable earlier pursuant to

the terms of the DIP Loan Documents and this Interim Order by way of acceleration or

otherwise) forty (40) days from the date of entry of this Interim Order.

2.     Jurisdiction; Venue.  The Court has jurisdiction over these cases, the parties and

the Debtors' property pursuant to 28 U.S.C. §1334.  This is a core proceeding pursuant to

28 U.S.C. §157(b)(2)(D).  Venue of the Chapter 11 Cases and the Motion is proper under 28

U.S.C. §§ 1408 and 1409.

3.     Purpose and Necessity of Financing.  The Debtors require the financing described

in the Motion to refinance certain of the Pre-Petition Obligations[3] and Obligations under the

Original DIP Order, and to fund, among other things, the Debtors' cash requirements for

working capital and general corporate needs for the 20 day period commencing on the date

hereof.  If the Debtors do not obtain authorization to borrow under the DIP Loan Agreement

and the DIP Loans are not approved on an interim basis, the Debtors will suffer immediate and

irreparable harm.  The DIP Loans will provide the Debtors with access to increased borrowing

availability at a time when they are up to or near the maximum available under the existing DIP

financing at an overall cost of funds lower than under the same.  Further, an integral part of the

existing DIP financing is the extremely tight time line for the sale process.  Under the terms of

the DIP Loan Agreement, the sale time line is substantially increased, thereby greatly improving

---

[3]     Of the approximately $5, 842,000 outstanding amount of Pre-Petition Obligations owed to Hilco, the DIP
Loan proceeds will be used to pay $5.6 million of those Obligations.

the prospects for the realization of a higher value upon the sale of the Debtors' assets. The

Debtors are unable to obtain adequate unsecured credit allowable under section 503 of the

Bankruptcy Code as an administrative expense or other financing under sections 364(c) or (d) of

the Bankruptcy Code on equal or more favorable terms than those set forth in the DIP Loan

Documents within the time frame required by their needs to avoid immediate and irreparable

harm. A loan facility in the amount provided by the DIP Loan Documents is not available to

the Debtors without granting to the DIP Lenders pursuant to sections 364(c)(1) and (2), and

364(d) of the Bankruptcy Code, the following:  (a) superpriority administrative claims with

respect to the DIP Obligations having priority over any and all administrative expenses of the

kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(b), 507,

546(c), 726 and 1114, whether or not such expenses or claims may become secured by a

judgment lien or other non-consensual lien, levy or attachment (except as otherwise expressly

provided for herein with respect to claims under section 506(c) of the Bankruptcy Code, the

Priority Professional Expenses (up to the Carve-Out Amount after an Event of Default or a

default hereunder) and UST/Clerk Fees); (b) as security for all DIP Obligations (i) under section

364(c)(2) of the Bankruptcy Code, a first priority, perfected lien on and security interest in the

Unencumbered Collateral, whether existing on the Filing Date or thereafter acquired (excluding

all Avoidance Actions, except to the extent provided in the Final Bankruptcy Court Order), and

all cash and non-cash proceeds, rents, products and profits of any of the foregoing, subject only

to (A) any Permitted Priority Liens, (B) during the occurrence and continuance of an Event of

Default or a default hereunder, the payment of Priority Professional Expenses up to the Carve-

Out Amount, and (C) UST/Clerk Fees, and (ii) secured under section 364(d)(1) of the

Bankruptcy Code, a first priority, perfected lien on and security interest in the Secured

Collateral (but excluding the property described in clause (b)(i) as to which the liens and security interests in favor of the DIP Lenders and the Agents will be as described in such clause), whether now existing or hereafter acquired, subject only to (A) any Permitted Priority Liens, (B) claims under section 506(c) of the Bankruptcy Code, (C) during the occurrence and continuance of an Event of Default or a default hereunder, the payment of Priority Professional Expenses up to the Carve-Out Amount and (D) UST/Clerk Fees. After considering all alternatives, the Debtors have concluded in the exercise of their prudent business judgment that the loan facility provided under the DIP Loan Documents represents the best financing available to them at this time.

4. _Good Cause_. The ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Loan Documents is vital to the estates of the Debtors and their creditors, so that the Debtors can continue to operate their businesses in the ordinary course. The preservation of the going concern value of the Debtors' businesses pending a sale of substantially all of the Debtors' assets is the linchpin of any successful reorganization. The Debtors' estates will be immediately and irreparably harmed if this Interim Order is not entered. Good cause has, therefore, been shown for the interim relief sought in the Motion.

5. _Good Faith_. The DIP Loan Documents and this Interim Order have been negotiated in good faith and at arm's-length between the Debtors and the DIP Lenders. Any DIP Loans and/or other financial accommodations made to the Debtors by the DIP Lenders pursuant to this Interim Order and the DIP Loan Agreement shall be deemed to have been extended by the DIP Lenders in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and the DIP Lenders shall be entitled to all protections afforded thereunder. The terms of the loan facility provided under the DIP Loan Documents are fair and reasonable,

reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

6.    _Interim Borrowing_.  The Debtors are immediately authorized to obtain interim DIP Loans pursuant to the terms of the DIP Loan Documents and this Interim Order in the amount of up to $13,500,000, consisting of (a) a revolving A credit facility in an aggregate principal amount not to exceed $8,000,000 at any time outstanding, subject to borrowing base limitations, (b) a revolving B credit facility in an aggregate principal amount not to exceed $1,000,000 at any time outstanding and (c) a term loan facility in the aggregate principal amount not to exceed $5,600,000 (which loans and advances shall be limited to $13,500,000 until the Final Bankruptcy Court Order shall have been entered by the Bankruptcy Court), as provided in the DIP Loan Documents.  Available financing and advances under the DIP Loan Agreement will be made to refinance certain of the Pre-Petition Obligations, the Obligations under the Original DIP Order, and to fund the Debtors' ordinary working capital and general corporate needs and other amounts required or allowed to be paid in accordance with this Interim Order and the DIP Loan Documents.  To the extent that (1) a Challenge (as that term is defined in this Court's order of April 13, 2004) respecting the claims and/or security interests of Transamerica Business Credit Corporation ("Transamerica") is not properly filed on or before the Challenge Deadline (as that term is defined in the Court's order of April 13, 2004) by such a party-in-interest or (2) if such a Challenge is so filed and Transamerica ultimately prevails thereon (whether initially, on appeal or otherwise), the repayment of the Transamerica Pre-Petition Obligation and Post Petition Obligations authorized and directed by this Interim Order shall constitute indefeasible payment of such indebtedness and shall be final for all purposes in this case and any subsequent proceedings under the Bankruptcy Code and shall be binding on

all parties, including, without limitation, the Debtors, their estates, all creditors of the Debtors and all successors and assigns (including any trustee, examiner or responsible person in this or any subsequent proceeding under the Bankruptcy Code).

7. <u>Stipulations</u>. In providing for post-petition financing under the DIP Loan Agreement, the Debtors acknowledge, represent, stipulate and agree that:

(a) all of the Debtors have obtained all authorizations, consents and approvals necessary from, and have made all filings with and given all notices to, all federal, state and local governmental agencies, authorities and instrumentalities required to be obtained, made or given by the Debtors in connection with the execution, delivery, performance, validity and enforceability of the DIP Loan Documents to which any Debtor is a party;

(b) in entering into the DIP Loan Documents, and except as otherwise provided herein, and as consideration therefor, the Debtors hereby agree that until such time as all DIP Obligations are indefeasibly paid in full, in cash, and the Commitments are terminated in accordance with the terms of the DIP Loan Agreement, the Debtors shall not in any way prime or seek to prime (*i.e.*, cause to be subordinated) the liens provided to the DIP Lenders and the Agents under this Interim Order by offering a subsequent lender or any party-in-interest a superior or *pari passu* lien, interest or claim pursuant to section 364(d) of the Bankruptcy Code or otherwise;

(c) all of the Debtors will receive and have received reasonable consideration in exchange for the making of the DIP Loans, and the other financial accommodations provided under the DIP Loan Documents and this Interim Order; and

(d) there are no other liens on or security interests in the Collateral except for the Permitted Liens.

8.     Fees and Deposit.   All fees paid and payable and costs and/or expenses reimbursed or reimbursable under the DIP Loan Documents and this Interim Order by the Debtors to the DIP Lenders or the Agents are hereby approved.  The Debtors are hereby authorized and directed to pay all such fees, in accordance with the terms of the DIP Loan Documents and this Interim Order, without the necessity of the Debtors, the DIP Lenders or the Agents filing any further application with the Court for approval or payment of such fees or expenses.  Upon payment of such fees, such fees shall be deemed fully earned and non-refundable, subject to any fee application process implemented by this Court.

9.     Authority to Execute and Deliver Necessary Documents.  Each of the Debtors is authorized and empowered to enter into and deliver the DIP Loan Agreement and the other DIP Loan Documents in each case including any amendments thereto, and including UCC financing statements and mortgages or deeds of trust encumbering all of the Collateral and securing all of the Debtors' obligations under the DIP Loan Agreement, including repayment of all DIP Obligations.  Each of the Debtors is hereby further authorized and directed (a) to perform all of their obligations under the DIP Loan Documents and such other agreements as may be required by the DIP Loan Documents to give effect to the terms of the financing provided for in this Interim Order; (b) to perform all acts required under the DIP Loan Documents and this Interim Order, including, without limitation, the payment of fees and the reimbursement of present and future reasonable costs and expenses (including without limitation, attorneys' fees and legal expenses) paid or incurred by the DIP Lenders or the Agents provided for in this Interim Order, the DIP Loan Agreement and the other DIP Loan Documents, all of which unpaid fees, commissions, costs and expenses shall be included and constitute part of the principal amount of the DIP Obligations, and be secured by a first priority lien on and security interest in all of

the Collateral, the DIP Loan Agreement and the other DIP Loan Documents; and (c) to do and perform all other acts, to make, execute and deliver all other instruments, agreements and documents, which may be reasonably requested by the DIP Lenders or the Agents. The obligations under the DIP Loan Documents and this Interim Order shall constitute valid and binding obligations of each of the Debtors enforceable against each of them, and each of their successors and assigns, in accordance with their terms and the terms of this Interim Order.

10.    Amendments.  The Debtors, with the express written consent of the requisite Lenders and/or the Agents as specified in the DIP Loan Agreement and the consent of the creditors' committee, may enter into any amendments or modifications to the DIP Loan Agreement and the other DIP Loan Documents without the need of further notice and hearing or order of this Court, provided that such modifications or amendments do not materially adversely affect the rights of any creditor, equity holder or party in interest, and provided further, that notice of any such amendment shall be filed with the Court and served upon counsel to the creditors' committee and the Office of the United States Trustee.

11.    Superpriority Claim and Lien Priority.

(a)    the DIP Lenders and the Agents are hereby granted an allowed superpriority administrative expense claim (the "Superpriority Claim") pursuant to section 364(c)(1) of the Bankruptcy Code for all of the DIP Obligations, having priority over any and all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(b), 507, 546(c), 726 and 1114, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, subject and subordinate in priority of payment only to (x) claims under section 506(c) of the Bankruptcy

Code, (y) the Priority Professional Expenses (up to the Carve-Out Amount after an Event of Default or a default hereunder) and (z) the UST/Clerk Fees;

(b)    subject only to Permitted Priority Liens and, during the occurrence and continuance of an Event of Default or a default hereunder, to the payment of Priority Professional Expenses up to the Carve-Out Amount and UST/Clerk Fees, as provided in this Interim Order, the DIP Lenders and the Agents are hereby granted, effective immediately: (i) a first priority, perfected security interest in, and lien, under section 364(c)(2) of the Bankruptcy Code, upon all of the Unencumbered Collateral, and (ii) a first priority, perfected security interest in and lien, under section 364(d)(1) of the Bankruptcy Code, upon all Secured Collateral (collectively, the "Post-Petition Liens");

(c)    no lien or security interest granted to the DIP Lenders or the Agents under this Interim Order, including the Post-Petition Liens, shall (i) be subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code, or (ii) hereafter be subordinated to or made *pari passu* with any other lien or security interest under section 364(d) of the Bankruptcy Code or otherwise;

(d)    the liens and security interests arising hereunder shall be and hereby are fully perfected liens and security interests, such that no additional steps need be taken nor shall any documents be required to be filed with any governmental unit by the DIP Lenders or the Agents to perfect such interests; and

(e)    the Post-Petition Liens, Superpriority Claim and other rights and remedies granted to DIP Lenders and the Agents under this Interim Order shall continue in this and in any superseding case or cases under the Bankruptcy Code, and such liens and security interests shall

maintain their first priority as provided in this Interim Order until all the DIP Obligations have been indefeasibly satisfied in full in cash and the Total Commitment is terminated.

12.    Priority Professional Expenses & UST/Clerk Fees Carve-Out. The payment of any amounts on account of the liens and security interests and the Superpriority Claim granted herein to the DIP Lenders and the Agents shall be subject and subordinate only to:

(a)    amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Court (collectively, the "UST/Clerk Fees"); and

(b)    allowed Priority Professional Expenses to the extent that the amount entitled to priority under this clause 12(b) of this Interim Order does not exceed $270,000 ($200,000 of such amount shall be applicable to the professional fees and expenses of counsel for the Debtors and $70,000 of such amount shall be applicable to the professional fees and expenses of counsel for the Committee) (the "Carve-Out Amount") outstanding in the aggregate at any time (inclusive of any holdbacks required by the Court); provided, however, that during the continuance of an Event of Default under the DIP Loan Documents or default by any of the Debtors or Guarantors in the performance or observance of any of their obligations under this Interim Order or any Bankruptcy Court Order, the Debtors shall be permitted to pay Priority Professional Expenses allowed and payable under sections 327, 328, 330 and 331 of the Bankruptcy Code, as the same may be due and payable in accordance with any applicable order of the Court, provided, however, that any and all such payments shall be first made from the application of pre-petition and post-petition retainers (the "Retainers") before any other funds are used for such payments, and such payments shall be applied against the Carve-Out Amount on a dollar-for-dollar basis after application of any pre-petition or post-petition retainers (the "Retainers"); provided, however, that any such payments made from the Retainers shall not

reduce the Carve-Out Amount  So long as no Event of Default under the DIP Loan Documents or a default by the Borrower or any Guarantor in any of their obligations under the Bankruptcy Court Orders shall have occurred and be continuing, the payment of administrative expenses allowed and payable under sections 327, 328, 330, 331 and 1103 of the Bankruptcy Code or otherwise shall not reduce the Carve-Out Amount; and

(c)    Priority Professional Expenses shall also include any payments which are authorized to be made pursuant to any Court-approved procedure for monthly or other payment of administrative expenses; provided, that nothing contained herein shall (i) be construed to exempt those persons hereafter receiving interim compensation payments or reimbursement of expenses pursuant to any such Court-approved procedure for interim payments of administrative expenses from the applicable provisions of bankruptcy law, including the requirements that such compensation or reimbursement be allowed on a final basis after the filing of appropriate fee applications and (ii) be construed as consent to the allowance of any fees and expenses referred to above and shall not affect any right of the DIP Lenders or the Agents to object to the reasonableness of such amounts; provided, further, that Priority Professional Expenses shall not include, and proceeds of the DIP Loans shall not be used for the payment or reimbursement of, any fees or disbursements of the Debtors or any Committees or trustee appointed in these Chapter 11 Cases incurred in connection with the assertion and prosecution of, or joinder in, any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief: (A) commencing or prosecuting any action asserting claims pursuant to sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code or other cause of action (whether arising under state law, the Bankruptcy Code or other federal law) against the DIP Lenders or the

Agents with respect to the validity and extent of the DIP Obligations or the validity, extent and priority of liens and security interests securing the DIP Obligations of the Debtors; (B) invalidating, setting aside, avoiding or subordinating, in whole or in part, the DIP Lenders' and the Agents' liens or security interests in the Collateral; (C) preventing, hindering or delaying (whether, directly or indirectly) the DIP Lenders or the Agents in respect of their liens and security interests in the Collateral. No liens, claims, interests or priority status other than Permitted Priority Liens, Priority Professional Expenses (up to the Carve-Out Amount after an Event of Default or a default hereunder) and UST/Clerk Fees, having a lien or administrative expense priority superior to or *pari passu* with those granted by this Interim Order to the DIP Lenders or the Agents shall be granted while any portion of the DIP Obligations remains outstanding or any Commitment under the DIP Loan Agreement remains in effect without the written consent of the Required Lenders under the DIP Loan Agreement.

13.    <u>Limitation On Additional Surcharges</u>. No action, inaction, or acquiescence by the DIP Lenders or the Agents, including funding the Debtors' ongoing operations under this Interim Order, shall be deemed to be or shall be considered as evidence of any alleged consent by the DIP Lenders or the Agents to a charge against the Collateral pursuant to sections 506(c) or 105(a) of the Bankruptcy Code. The DIP Lenders and the Agents shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.[4]

14.    <u>Additional Perfection Measures</u>.

---

[4]    For the avoidance of doubt, and for the purposes of this Interim Order, the DIP Lenders do not seek to obtain, and the Debtors do not seek to grant, a waiver of their right to surcharge the Collateral, the DIP Lenders, the Agents, under section 506(c) of the Bankruptcy Code, <u>however</u>, the DIP Lenders and the Debtors reserve their right and intend to seek this Court's approval to include such a waiver in any Final Order.

(a)     The liens, security interests and priority granted to the DIP Lenders and the Agents pursuant to this Interim Order with respect to property of the Debtors' estates shall be perfected by operation of law upon entry of this Interim Order by the Court. Neither the Debtors nor the DIP Lenders or the Agents shall be required to enter into or to obtain landlord waivers, mortgagee waivers, bailee waivers, warehouseman waivers or other waiver or consent, or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including, trademark, copyright, trade name or patent assignment filings with the United State Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property), or obtain consents from any licensor or similarly situated party-in-interest, or take any other action in order to validate and to perfect the security interests and liens granted to the DIP Lenders and the Agents pursuant to this Interim Order, provided, however, that, if the DIP Lenders in their sole discretion elect to file this Interim Order of record to evidence perfection of the DIP Lenders liens and security interests, then any recording office is hereby directed to accept a copy of this Interim Order for such purpose;

(b)     If the DIP Lenders or the Agents, in their sole discretion, choose to obtain consents from any landlord, licensor or other party in interest, to file mortgages, financing statements, notices of lien or similar instruments, or to otherwise record or perfect such security interests and liens: (i) all such documents shall be deemed to have been recorded and filed as of the time and on the date of entry of this Interim Order; and (ii) no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder;

(c)     In lieu of obtaining such consents or filing any such mortgages, financing statements, notices of lien or similar instruments, the DIP Lenders or the Agents may, at their

sole discretion, choose to file a true and complete copy of this Interim Order in any place at which any such instruments would or could be filed, together with a description of Collateral located within the geographic area covered by such place of filing, and such filing by the DIP Lenders or the Agents shall have the same effect as if such mortgages, deeds of trust, financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Interim Order.

15.   <u>Application of Collateral Proceeds</u>.  Except as otherwise provided in this Interim Order, the Debtors are hereby authorized and directed to remit to the DIP Lenders or the Agents, as the case may be, one-hundred percent (100%) of all collections on, and proceeds of, the Collateral, including all accounts receivable collections, proceeds of sales of inventory, fixed assets and any other assets, including sales in and outside the ordinary course of business, and all other cash or cash equivalents which shall at any time on or after the Petition Date come into the possession or control of the Debtors, or to which Debtors shall become entitled at any time.  The automatic stay of section 362 of the Bankruptcy Code, to the extent applicable, is hereby modified to permit the DIP Lenders or the Agents to retain and apply all collections, remittances and proceeds of the Collateral in accordance with this Interim Order and the DIP Loan Agreement to the DIP Obligations.  Notwithstanding any cash management agreements or any order entered continuing the Debtors' use of their current cash management system, no third party shall be entitled to use the proceeds of any Collateral in any accounts maintained or controlled by them, except as provided under the DIP Loan Documents and this Interim Order, and any funds currently held, or received by any such third party after the Petition Date, shall be held by such third party until such time as the Debtors' cash management system has been modified to give effect to the DIP Loan Agreement.

{A0065851.DOC 2}                                  18

16.    <u>Access to Information</u>.    Without limiting the rights of access and information afforded the DIP Lenders or the Agents under the DIP Loan Agreement, the Debtors shall permit representatives, agents and/or employees of the DIP Lenders and the Agents to have reasonable access to their premises and their records during normal business hours (without unreasonable interference with the proper operation of the Debtors' businesses) and shall cooperate, consult with, and provide to such persons all such non-privileged information as they may reasonably request.

17.    <u>Access to Collateral</u>.

(a)    Upon the occurrence of an Event of Default or violation of this Interim Order, the DIP Lenders or Agents are authorized without further order of this Court, to enter upon any leased or licensed premises of any of the Debtors for the purpose of exercising any remedy with respect to Collateral located thereon and shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under such lease or license without interference from the landlords or licensors thereunder, <u>provided</u> that the DIP Lenders or Agents shall only pay base rent, or other obligations as required under the Bankruptcy Code, of the Debtors that first arises after the DIP Lenders' or Agents' written notice referenced above and that are payable during the period of such occupancy by the DIP Lenders or the Agents, as the case may be, calculated on a per diem basis. Nothing herein shall require the Debtors, DIP Lenders or Agents to assume any lease under section 365(a) of the Bankruptcy Code as a precondition to the rights afforded to the DIP Lenders in this paragraph. Such motion for relief from the automatic stay shall be heard, at the request of the DIP Lenders or the Agents, on two business day's prior notice of such motion to the Debtors, any committees, any affected landlord or licensor and the United States Trustee, which notice may be provided by e-mail or facsimile transmission. The Court shall endeavor to

schedule a hearing on any such request for relief from the automatic stay at the earliest practicable date and shall take all reasonable steps to resolve such motion as promptly as possible. Nothing contained herein shall be deemed a waiver by the DIP Lenders or the Agents of their respective rights to claim that no relief from the automatic stay is needed in order to exercise any remedies with respect to an Event of Default or a violation of this Order;

(b)    Debtors shall give the DIP Lenders and the Agents, their representatives and consultants, reasonable access to the Debtors' facilities, offices, books and records during normal business hours to enable such parties, among other things, to inspect the Collateral.

18.    Cash Management Systems. The Debtors are authorized and directed to maintain their cash management system in a manner consistent with the DIP Loan Documents and this Interim Order.

19.    Automatic Stay Modified. The automatic stay provisions of section 362 of the Code are, to the extent applicable, vacated and modified to the extent necessary so as to permit the Lenders:

(a)    whether or not an Event of Default or a default by the Debtors of any of their obligations under this Interim Order has occurred, to require all cash, checks or other collections or proceeds from Interim Collateral received by the Debtors to be deposited in accordance with the DIP Loan Documents, and to apply amounts deposited in any such account and other amounts paid to or received by the Lenders under the DIP Loan Agreement and the other DIP Loan Documents as provided in the DIP Loan Agreement;

(b)    upon the occurrence of an Event of Default or a default by the Debtors of any of their obligations under this Interim Order, and subject to three (3) business days' prior written notice to the Debtors, their counsel, counsel for the creditors' committee, and the United

States Trustee, to exercise all rights and remedies provided for in the DIP Loan Agreement, the other DIP Loan Documents, this Interim Order or under other applicable bankruptcy and nonbankruptcy law (including the right to setoff funds in accounts maintained by the Debtors with any Lenders to repay the DIP Obligations, as to which such prior written notice shall not be required) without requiring prior authorization of this Court in order to exercise such rights and remedies. The automatic stay of Code section 362(a), to the extent applicable, shall be deemed terminated as provided herein without the necessity of any further action by the Court in the event that the Debtors, any committee and/or the United States Trustee have not obtained an order from this Court to the contrary within three (3) business days, after receiving such notice from the Lenders pursuant to this Interim Order. The only issue that may be raised at any such hearing shall be whether, in fact, an Event of Default or default has occurred and is continuing. If the Court concludes an Event of Default occurred and is continuing, the automatic stay shall be modified.

(c)    this Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Interim Order and relating to the application, re-imposition or continuance of the Code section 362(a) automatic stay, or other injunctive relief requested; and

(d)    Upon the occurrence and continuance of an Event of Default or a violation of this Interim Order by any of the Debtors, the DIP Lenders and the Agents shall have no further obligation to provide financing under the DIP Loan Documents or this Interim Order, and the DIP Lenders and the Agents are hereby authorized to, without providing any prior notice thereof, accelerate the obligations under the DIP Loan Documents, terminate any further commitment to lend (the effectiveness of such commitment termination will be subject to the 3

{A0065851.DOC 2}    21

business day notice provided pursuant to paragraph 19(b) hereinabove) and/or charge interest at the default rate set forth in the DIP Loan Agreement. The DIP Lenders or the Agents shall provide the Debtors and any committee with prompt notice of any violation of this Interim Order.

20. <u>No Responsible Person</u>. In making the decision to make DIP Loans and to extend other financial accommodations to the Borrower under the DIP Loan Agreement and this Interim Order or to collect the indebtedness and obligations of the Debtors, the DIP Lenders and the Agents shall not be deemed to be in control of the operations of the Debtors or to be acting as a responsible person or owner or operator with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar federal or state statute).

21. <u>Successors and Assigns</u>. The DIP Loan Documents and the provisions of this Interim Order shall be binding upon the DIP Lenders, the Agents, the Debtors and their respective successors and assigns, and shall inure to the benefit of the DIP Lenders, the Agents, and the Debtors and their respective successors and assigns including, without limitation, any trustee, responsible officer, estate administrator or representative, or similar person appointed in a case for the Debtors under any chapter of the Bankruptcy Code.

22. <u>Binding Nature of Agreement</u>. Each of the DIP Loan Documents to which the Debtors are and will become a party shall constitute legal, valid and binding obligations of the Debtors, enforceable in accordance with their terms. The DIP Loan Documents have been or will be properly executed and delivered to the DIP Lenders by the Debtors. The rights, remedies, powers, privileges, liens and priorities of the DIP Lenders provided for in this Order

and in any other DIP Loan Documents shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation order) or by any plan of reorganization or liquidation in these cases or in any subsequent case under the Bankruptcy Code unless and until the DIP Obligations have first been paid in full in cash, all DIP Obligations have been completely satisfied and the Total Commitment terminated in accordance with the DIP Loan Agreement.

23.    Subsequent Reversal or Modification.    This Interim Order is entered pursuant to sections 364 of the Bankruptcy Code, granting DIP Lenders all protections afforded by sections 364(e) of the Bankruptcy Code.    If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, that action will not affect (a) the validity of any obligation, indebtedness or liability incurred hereunder by any of the Debtors to the DIP Lenders prior to the date of receipt of written notice to the DIP Lenders of the effective date of such action; or (b) the validity and enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Loan Documents or pursuant to this Interim Order. Notwithstanding any such reversal, stay, modification or vacatur, any post-petition indebtedness, obligation or liability incurred by any of the Debtors to the DIP Lenders prior to written notice to the DIP Lenders of the effective date of such action shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lenders shall be entitled to all the rights, remedies, privileges and benefits granted herein and in the DIP Loan Documents with respect to all such indebtedness, obligation or liability.

24.    No Waiver.    This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lenders or the Agents may have to bring or be heard on any matter brought before this Court.

25.    <u>Dismissal/Sale</u>.  No order dismissing or converting these chapter 11 cases under section 1112 of the Bankruptcy Code, or appointing a chapter 11 trustee or an examiner with expanded powers, shall be entered or motion filed by the Debtors for any such relief unless such order shall provide that the DIP Obligations shall be paid indefeasibly in full, in cash, and all DIP Obligations shall be completely satisfied and the Total Commitment terminated in accordance with the DIP Loan Agreement, or unless and until DIP Lenders shall have had a reasonable period of time to perfect all of their liens under applicable law prior to the entry thereof.  No order providing for either the sale of the ownership of the stock of the Debtors or the sale of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code shall be entered by the Court unless, in connection and concurrently with any such event, the proceeds of such sale are sufficient, and applied, to indefeasibly pay in full all DIP Obligations and such DIP Obligations shall be indefeasibly paid in full in cash and all DIP Obligations completely satisfied and the Total Commitment will be terminated in accordance with the DIP Loan Agreement as part of such action, or the DIP Lenders expressly consent in writing to any such transaction or the entry of such an order by the Court or such transaction is expressly permitted in the DIP Loan Documents.  The Debtors shall not sell either the stock of any of the Debtors or substantially all of the assets of any of the Debtors under section 363 of the Bankruptcy Code unless, in any such event, the DIP Lenders expressly consent in writing to any such transaction, such transaction is expressly permitted in the DIP Loan Documents or the terms of the sale expressly provide that the sale shall not be consummated unless the proceeds of the sale are sufficient, and applied, to indefeasibly pay all DIP Obligations and such DIP Obligations shall be, upon the closing of such sale, indefeasibly in full in cash and completely satisfied, and the Total Commitment terminated in accordance with the DIP Loan Agreement or

the DIP Lenders expressly consent in writing to any such transaction. If an order dismissing any of these cases under sections 305 or 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide that (a) the liens, security interests and superpriority administrative expense status granted to the DIP Lenders hereunder and in the DIP Loan Documents, as the case may be, shall continue in full force and effect, shall remain binding on all parties in interest and shall maintain their priorities as provided in this Interim Order until all DIP Obligations shall have been paid in full in cash and the Total Commitment shall have been terminated in accordance with the DIP Loan Agreement, and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the liens, security interests and superpriority administrative expense status of the DIP Lenders, as the case may be.

26.    Priority of Terms.  To the extent of any conflict between or among the express terms or provisions of any of the DIP Loan Documents, the Motion, any other order of this Court, or any other agreements, the terms and provisions of this Interim Order shall govern.

27.    Financial Information. The Committee shall be entitled to receive from the Debtors such financial information and reports as the Debtors supply to the DIP Lenders under the DIP Loan Documents.

28.    Adequate Notice.  The notice given by the Debtors of the Interim Hearing was given in accordance with Bankruptcy Rules 2002 and 4001(c)(2) and the local rules of this Court.  Under the circumstances, no further notice of the request for the relief granted at the Interim Hearing is required.  The Debtors shall promptly mail copies of this Interim Order and notice of the Final Hearing (as defined below) to the Notice Parties.  Any objection to the relief sought at the Final Hearing shall be made in writing setting forth with particularity all facts relied upon and all grounds therefor, and filed with the Court and served so as to be actually

received no later than five days prior to the Final Hearing by the following: (i) counsel to the Debtors, Shaw Gussis Fishman Glantz Wolfson & Towbin LLC, 321 N. Clark Street, Suite 800, Chicago, Illinois 60610; Attn: Robert M. Fishman; (ii) counsel to DIP Lenders, Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, Attn: Eliot Relles and Robert Mrofka; (iii) counsel for Transamerica, Winston & Strawn, 35 W. Wacker Dr., Chicago, Illinois 60601, Attn: Daniel J. McGuire; (iv) counsel for Hilco, Vedder, Price, Kaufman and Kammholz P.C., 222 North LaSalle Street, Suite 2600, Chicago, Illinois 60601, Attn: Michael M. Eidelman; (v) counsel to the committee of unsecured creditors, Quarles & Brady LLP, 500 West Madison, Suite 3700, Chicago, Illinois 60661, Attn: Faye B. Feinstein, and (vi) United States Trustee for the Northern District of Illinois.

29. _Final Hearing Date._ A final hearing to consider the entry of the Final Bankruptcy Court Order approving the relief sought in the Motion shall be held on June 9, 2004 at 10:00 a.m. (as the same may be adjourned or continued by the Court) (the "Final Hearing").

30. _Entry of Order; Effect._ This Interim Order shall take effect immediately upon execution hereof, notwithstanding the possible application of Fed. R. Bankr. P. 6004(g), 7062, 9014, or otherwise, and the Clerk of the Court is hereby directed to enter this Interim Order on the Court's docket in these cases.

31. _Binding Effect of Order._ The terms of this Interim Order shall be binding on any trustee appointed under Chapter 7 or Chapter 11 of the Bankruptcy Code.

Dated: Chicago, Illinois
      May 12, 2004

 

_____
**UNITED STATES BANKRUPTCY JUDGE**

## POST-PETITION LOAN AND SECURITY AGREEMENT

**POST-PETITION LOAN AND SECURITY AGREEMENT**, dated as of May 13, 2004, among **APPLIANCE CONTROLS GROUP, INC.**, as a debtor and a debtor-in-possession, a Delaware corporation (the "Borrower"), each of the financial institutions identified as a Lender on Schedule 1 (together with each of their respective direct and indirect successors and assigns, each, a "Lender," and collectively, the "Lenders"), and **HILCO CAPITAL LP**, a Delaware limited partnership ("Hilco"), as agent for the Lenders (the "Agent").

**WHEREAS**, on April 12, 2004 (the "Filing Date"), the Borrower and the Holding Company (as defined below) commenced cases (the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court"), and the Borrower and the Holding Company have retained possession of their assets and are authorized under the Bankruptcy Code to continue the operation of their businesses as debtors-in-possession; and

**WHEREAS**, on April 13, 2004 (the "Original Closing Date"), pursuant to the terms of the Original DIP Order (as defined below), certain of the Pre-Petition Revolving Lenders and the Pre-Petition Term Lender (as such terms are defined below) agreed to make post-petition loans and advances to Borrower;

**WHEREAS**, the Borrower and the Guarantors have asked the Lenders to make post-petition loans and advances to the Borrower consisting of (a) a revolving A credit facility in an aggregate principal amount not to exceed $8,000,000 at any time outstanding, (b) a revolving B credit facility in an aggregate principal amount not to exceed $1,000,000 at any time outstanding, and (c) a term loan facility in an aggregate principal amount not to exceed $5,600,000 (which loans and advances shall be limited to $13,500,000 until the Final Bankruptcy Court Order (as hereinafter defined) shall have been entered by the Bankruptcy Court). The proceeds of the loans made under the revolving credit facilities and the term loan credit facility shall be used (i) to refinance existing indebtedness of the Borrower under the Original DIP Order, (ii) to refinance existing indebtedness of the Borrower under the Pre-Petition Revolving Loan Agreement (as defined below), (iii) to refinance a portion of the existing indebtedness of the Borrower under the Pre-Petition Term Loan Agreement (as defined below), (iv) for general working capital requirements and other general corporate purposes of the Borrower and (v) to pay fees and expenses related to this Agreement. The Lenders are severally, and not jointly, willing to make such loans and advances to the Borrower subject to the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, the Borrower, the Guarantors, the Lenders and the Agent hereby agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.1    General Definitions. As used herein, the following terms shall have the meanings herein specified (to be equally applicable to both the singular and plural forms of the terms defined):

"Acceptance Date" has the meaning specified in Section 11.7(b).

**EXHIBIT**

**A**

{A0065850.DOC 5}

"Adjusted Earnings" means, for any period, with respect to the Borrower and its Subsidiaries on a consolidated basis (i) net income (as that term is determined in accordance with GAAP) for such period, plus (ii) the amount of depreciation and amortization of fixed and intangible assets deducted in determining such net income for such period, plus (iii) all Interest Expense and all fees for the use of money or the availability of money, including commitment, facility and like fees and charges upon Indebtedness (including Indebtedness to the Lenders) paid or payable during such period, plus (iv) all tax liabilities paid or accrued during such period, less (v) the amount of all gains (or plus the amount of all losses) realized during such period upon the sale or other disposition of property or assets that are sold or otherwise disposed of outside the ordinary course of business.

"Affiliate" means, as to any Person, any other Person who directly or indirectly controls, is under common control with, is controlled by or is a director or officer of such Person. As used in this definition, "control" (including its correlative meanings, "controlled by" and "under common control with") means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise), provided that, in any event, any Person who owns directly or indirectly ten percent (10%) or more of the securities having ordinary voting power for the election of the members of the board of directors or other governing body of a corporation or ten percent (10%) or more of the partnership or other ownership interests of any other Person (other than as a limited partner of such other Person) will be deemed to control such corporation, partnership or other Person.

"Agent" has the meaning specified in the introductory paragraph.

"Agent Loan" has the meaning specified in Section 2.3(h).

"Agent's Payment Account" means an account of the Agent maintained at a bank in the United States designated by the Agent from time to time as the account into which the Borrower and Guarantors shall make all payments to the Agent for the benefit of the Agent and the Lenders.

"Agreed Administrative Expense Priorities" means that administrative expenses with respect to the Borrower and the Holding Company and, with respect to sub-clause (ii) of clause "first", any official committee appointed by the Bankruptcy Court, shall have the following order of priority of payment:

first, (i) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and (ii) allowed fees and expenses of attorneys retained in the Chapter 11 Cases pursuant to Sections 327, 328, 330, 331 and 1103 of the Bankruptcy Code, to the extent that the amount entitled to priority under this sub-clause (ii) of this clause first ("Priority Professional Expenses") does not exceed $270,000 ($200,000 of which shall be applicable to the fees and expenses of counsel for the Debtors and $70,000 of which shall be applicable to the fees and expenses of counsel for the Committee) outstanding in the aggregate at any time (inclusive of any holdbacks required by the Bankruptcy Court) (the "Professional Expense Cap"), so long as the Priority Professional Expenses are not incurred in connection with any activity prohibited under the Bankruptcy Court Orders; provided, however, that (A) during the continuance of an Event of Default

hereunder or a default by the Borrower or the Holding Company in any of their obligations under any of the Bankruptcy Court Orders, any payments actually made to such professionals during such continuance, under Sections 327, 328, 330, 331 and 1103 of the Bankruptcy Code or otherwise, shall reduce the Professional Expense Cap on a dollar-for-dollar basis, (B) for the avoidance of doubt, so long as no Event of Default or a default by the Borrower or the Holding Company in any of their obligations hereunder or under any of the Bankruptcy Court Orders shall have occurred and be continuing, the payment of administrative expenses allowed and payable under Sections 327, 328, 330, 331 and 1103 of the Bankruptcy Code or otherwise shall not reduce the Professional Expense Cap, and (C) payments made to such professionals from any pre-petition or post-petition retainers (the "Retainers") in their possession shall not reduce the Professional Expense Cap; provided, however, that Priority Professional Expenses shall be paid to such professionals only after applications of said Retainers,

second, all Obligations in accordance with Section 3.2, and

third, all other allowed administrative expenses.

"Agreement" means this Post-Petition Loan and Security Agreement, as amended, supplemented or otherwise modified from time to time.

"Approval Order" has the meaning specified in Section 9.1(x).

"Assignment and Acceptance" means an assignment and acceptance entered into by a Lender and its assignee, and accepted by the Agent, and substantially in the form of Exhibit B.

"Auditors" means a nationally recognized firm of independent public accountants selected by the Borrower and reasonably satisfactory to the Agent.

"Avoidance Actions" means all causes of action arising under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(e) of the Bankruptcy Code and any proceeds therefrom.

"Bankruptcy Code" has the meaning specified therefor in the recitals hereto.

"Bankruptcy Court" has the meaning specified therefor in the recitals hereto.

"Bankruptcy Court Orders" means the Interim Bankruptcy Court Order and the Final Bankruptcy Court Order.

"Base Rate" means the greater of (i) 4% and (ii) the highest prime, base or equivalent rate of interest publicly announced from time to time by LaSalle National Bank or any successor to the foregoing bank (which may not be the lowest rate of interest charged by such bank).

"Blocked Account" has the meaning specified in Section 2.7.

"Blocked Account Agreement" has the meaning specified in Section 2.7.

"Blocked Account Bank" means Bank of America, N.A. or any successor or any other bank acceptable to the Agent to act as such.

"Borrower" has the meaning specified in the introductory paragraph.

"Borrower's Account" means the account maintained by the Borrower at Bank of America, N.A. in Atlanta, Georgia or such other account as the Borrower may from time to time designate in writing to the Agent.

"Borrowing" has the meaning specified in Section 2.3(a).

"Borrowing Base" has the meaning specified in Section 2.1(a).

"Borrowing Base Certificate" has the meaning specified in Section 7.1(k)(v).

"Borrowing Date" means the date on which a Borrowing is obtained.

"Budget" means the eleven week cash requirement forecast setting forth cash collections and disbursements of the Loan Parties for the periods covered thereby or any other projections or forecasts prepared on a weekly basis by or on behalf of the Borrower and delivered by the Borrower to the Agent and the Lenders on or before the Interim Facility Effective Date pursuant to Section 5.1(b)(vii) hereto and each month thereafter pursuant to Section 7.1(k)(ii) hereto (or more frequently should the Borrower so elect, but in any event no more frequently than on a weekly basis), which are in form consistent with the eleven week cash requirement forecast heretofore delivered to the Agent and shall be in substance reasonably satisfactory to the Agent and the Lenders at the time of delivery thereof.

"Business Day" means any day other than a Saturday, a Sunday or any other day on which commercial banks in New York, New York or Chicago, Illinois are required or permitted by law to close.

"Capital Expenditures" means expenditures for any fixed assets or improvements, replacements, substitutions or additions thereto or therefor which have a useful life of more than one year, and shall include all commitments, payments in respect of Capitalized Lease Obligations and leasehold improvements.

"Capitalized Lease Obligations" means any rental obligation which, under GAAP, is or will be required to be capitalized on the books of the lessee, taken at the amount thereof accounted for as indebtedness (net of Interest Expense) in accordance with GAAP.

"Carve-Out Expenses" means those amounts, fees, expenses and claims set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities."

"Cash Equivalents" means (i) securities issued, guaranteed or insured by the United States or any of its agencies with maturities of not more than one year from the date acquired; (ii) certificates of deposit with maturities of not more than one year from the date acquired, issued by (A) the Agent or its Affiliates; (B) any U.S. federal or state chartered commercial bank of recognized standing which has capital and unimpaired surplus in excess of $500,000,000; or

(C) any bank or its holding company that has a short-term commercial paper rating of at least A-1 or the equivalent by Standard & Poor's Ratings Services or at least P-1 or the equivalent by Moody's Investors Service, Inc.; (iii) repurchase agreements and reverse repurchase agreements with terms of not more than seven days from the date acquired, for securities of the type described in clause (i) above and entered into only with commercial banks having the qualifications described in clause (ii) above or such other financial institutions with a short-term commercial paper rating of at least A-1 or the equivalent by Standard & Poor's Ratings Services or at least P-1 or the equivalent by Moody's Investors Service, Inc.; (iv) commercial paper, other than commercial paper issued by the Holding Company or any of its Affiliates, issued by any Person incorporated under the laws of the United States or any state thereof and rated at least A-1 or the equivalent thereof by Standard & Poor's Ratings Services or at least P-1 or the equivalent thereof by Moody's Investors Service, Inc., in each case with maturities of not more than one year from the date acquired; (v) investments in money market funds registered under the Investment Company Act of 1940, which have net assets of at least $500,000,000 and at least eighty-five percent (85%) of whose assets consist of securities and other obligations of the type described in clauses (i) through (iv) above; and (vi) other instruments, commercial paper or investments acceptable to the Lender in its sole discretion.

"Chapter 11 Cases" has the meaning specified in the recitals hereto.

"Claims" has the meaning specified in Section 11.4(a).

"Closing Date" means the date of execution and delivery of this Agreement.

"Code" has the meaning specified in Section 1.3.

"Collateral" has the meaning specified in Section 3.1(a).

"Collateral Access Agreements" means an agreement in writing, in form and substance satisfactory to Agent, from any lessor of premises to the Borrower, or any other Person to whom any Collateral (including Inventory, Equipment, bills of lading or other documents of title) is consigned or who has custody, control or possession of any Collateral or is otherwise the owner or operator of any premises on which any of such Collateral is located, pursuant to which such lessor, consignee or other Person, inter alia, acknowledges the security interest of the Agent in such Collateral, agrees to waive any and all claims such lessor, consignee or other Person may, at any time, have against such Collateral, whether for processing, storage or otherwise, and agrees to permit the Agent access to, and the right to remain on, the premises of such lessor, consignee or other Person so as to exercise the Agent's rights and remedies and otherwise deal with such Collateral and, in the case of any consignee or other person who at any time has custody, control or possession of any Collateral, acknowledges that it holds and will hold possession of the Collateral for the benefit of the Agent and agrees to follow all instructions of the Agent with respect thereto.

"Collections" means all cash, funds, checks, notes, instruments, any other form of remittance tendered by account debtors in respect of payment of Receivables of the Borrower and any other payments received by the Loan Parties with respect to any Collateral.

"Commitment" means, with respect to any Lender, its aggregate commitment to make Loans up to the amount set forth opposite its name on Schedule 1 or in the Assignment and Acceptance pursuant to which such Lender became a Lender hereunder in accordance with the

provisions of Section 11.7 hereof, as the same may be adjusted from time to time in accordance with the terms hereof.

"Contingent Obligation" means any direct, indirect, contingent or non-contingent guaranty or obligation for the Indebtedness of another Person, except endorsements in the ordinary course of business.

"Control Agreement" means a control agreement, in form and substance satisfactory to the Agent, among one or more of the Borrower or its Subsidiaries, the Agent and the applicable securities intermediary or depository bank with respect to the applicable Securities Account and related Investment Property or deposit account, as the case may be.

"Default" means any of the events specified in Section 9.1, whether or not any of the requirements for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

"Defaulting Lender" has the meaning specified in Section 2.10(a).

"Dollars" and the sign "$" means freely transferable lawful currency of the United States.

"Eligible Assignee" means (i) a Lender or any Affiliate thereof; (ii) a commercial bank organized or licensed under the laws of the United States or a state thereof having total assets in excess of $100,000,000; (iii) a finance company, insurance company or other financial institution or fund, which is regularly engaged in making, purchasing or investing in loans and having total assets in excess of $100,000,000; or (iv) a savings and loan association or savings bank organized under the laws of the United States or a state thereof which has a net worth, determined in accordance with GAAP, in excess of $100,000,000; provided, however, that (A) neither a Loan Party nor an Affiliate of a Loan Party shall qualify as an Eligible Assignee, (B) each Eligible Assignee under clauses (ii) through (iv) hereof shall be reasonably acceptable to and subject to the consent of the Agent and (C) nothing herein shall restrict or require the consent of any Person to the pledge by any Lender of all or any portion of its rights and interests under this Agreement, its Notes or any other Loan Document to any Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System or U.S. Treasury Regulation 31 CFR 203.14, and such Federal Reserve Bank may enforce such pledge in any manner permitted by applicable law.

"Eligible Inventory" means only such Inventory of the Borrower located in the United States consisting of raw materials or finished goods, which is free from any claim of title or Lien in favor of any Person (other than Liens in favor of the Agent and Liens permitted under Section 7.2(a)(i)) and with respect to which no event has occurred and no condition exists which could be reasonably expected to impair substantially the Borrower's ability to use or sell such Inventory in the ordinary course of its business and which the Agent, in its Permitted Discretion, shall deem eligible to serve as collateral for Loans, based on such considerations as the Agent may deem appropriate from time to time and less any such reserves as the Agent or the Revolving Credit A Loan Lenders, in their Permitted Discretion, may require, including, without limitation, reserves for special order goods.  No Inventory of the Borrower shall be Eligible Inventory unless the Agent

has a perfected first priority Lien thereon. The value of Eligible Inventory shall be computed at the lower of cost (computed on a "first in, first out" basis) or market. Any Inventory of the Borrower that is not in the control or possession of the Borrower and is covered by a warehouse receipt, a bill of lading or other document of title shall in no event be Eligible Inventory unless such warehouse receipt, bill of lading or document of title is in the name of or held by the Agent. No Inventory of the Borrower shall be Eligible Inventory unless it is located in the United States and (i) it is located on property owned by the Borrower; or (ii) it is located on property leased by the Borrower or in a contract warehouse which is subject to a Collateral Access Agreement executed by the mortgagee, lessor or contract warehouseman, as the case may be, and segregated or otherwise separately identifiable from goods of others, if any, stored on the premises. No Inventory of the Borrower shall be Eligible Inventory if it is in transit or it is consigned to or from the Borrower. In addition, and without limitation of the foregoing, the Agent may treat any Inventory as ineligible if:

        (a)    it is not owned solely by the Borrower or the Borrower does not have sole and good, valid and marketable title thereto; or

        (b)    it is packing or shipping materials or maintenance supplies; or

        (c)    it is goods returned or rejected by the Borrower's customer; or

        (d)    it is work in process; or

        (e)    it (i) is excess (as so reserved by the Borrower from time to time or as otherwise determined by the Agent) or (ii) is obsolete, defective, damaged, slow moving or unmerchantable, or (iii) is samples or Inventory on hand which is used for promotional and other sales activities, or (iv) does not otherwise conform to the representations and warranties contained in the Loan Documents; or

        (f)    it is repossessed, attached, seized, made subject to a writ or distress warrant, levied upon or brought within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors; or

        (g)    it is goods acquired by the Borrower in or as part of a "bulk" transfer or sale of assets and such acquisition is not consummated in the ordinary course of business unless the Borrower has complied with all applicable bulk sales or bulk transfer laws in connection with such acquisition.

"Eligible Receivables" means and includes only those unpaid Receivables of the Borrower, without duplication, which (i) arise out of a bona fide sale of goods or rendition of services of the kind ordinarily sold or rendered by the Borrower in the ordinary course of its business, (ii) are made to a Person competent to contract therefor who is not an Affiliate or an employee of the Borrower and is not controlled by an Affiliate of the Borrower, (iii) are not subject to renegotiation or redating, (iv) are free and clear of any Lien in favor of any Person other than Liens in favor of the Agent and Liens permitted under Section 7.2(a)(i) and (v) mature as stated in the invoice or other supporting data covering such sale or services. No Receivable of the Borrower shall be an Eligible Receivable unless the Agent has a perfected first priority Lien thereon. No Receivable of the Borrower shall be an Eligible Receivable if it is more than sixty (60) days past the due date set forth in the original invoice. No Receivable of the Borrower shall be an Eligible

Receivable if it is ninety (90) days from original invoice date with respect to Receivables other than Extended Term Receivables, or one hundred and twenty (120) days from original invoice date with respect to Extended Term Receivables. Subject to the provisions of clause (i) below, no Receivable of the Borrower shall be an Eligible Receivable unless the delivery of the goods or the rendition of the services giving rise to such Receivable has been completed. The Agent may treat any Receivable as ineligible if:

(a)     any warranty contained in this Agreement or in any other Loan Document with respect to such Receivable or in any assignment or statement of warranties or representations relating to such Receivable delivered by the Borrower to the Agent has been breached or is untrue in any material respect; or

(b)     the account debtor or any Affiliate of the account debtor has disputed liability, has or has asserted a right of setoff or has made any claim with respect to any other Receivable due from such account debtor or Affiliate to the Borrower, to the extent of the amount of such dispute or claim, or the amount of such actual or asserted right of setoff, as the case may be; or

(c)     the account debtor or any of its assets or any Affiliate of the account debtor or any of its assets is the subject of an Insolvency Event or, in the sole discretion of the Agent, is likely to become the subject of an Insolvency Event, unless such account debtor or Affiliate has been provided with a debtor in possession credit facility pursuant to Section 364 of the Bankruptcy Code or a similar arrangement reasonably acceptable to the Agent; or

(d)     the account debtor or any Affiliate of the account debtor has called a meeting of its creditors to obtain any general financial accommodation; or

(e)     the account debtor is also a supplier to or creditor of the Borrower, to the extent of the aggregate amount owed by the Borrower to the account debtor; or

(f)     the chief executive office (or, in the case of an individual, the principal residence) of the account debtor with respect to such Receivable is located outside the United States, unless either the account debtor has delivered to the Borrower an irrevocable letter of credit issued or confirmed by a bank satisfactory to the Agent and payable only in the United States of America and in U.S. dollars, sufficient to cover such Receivable, in form and substance satisfactory to Agent and if requested by the Agent, the original of such letter of credit has been delivered to the Agent or the Agent's agent and the Borrower has complied with the Agent's instructions with respect to the assignment of the proceeds of such letter of credit to the Agent or naming the Agent as transferee beneficiary thereunder, as the Agent may specify; or

(g)     fifty percent (50%) or more of the accounts of any account debtor and its Affiliates to the Borrower is unpaid more than (i) ninety (90) days past the date of the original invoices therefore with respect to Receivables other than Extended Term Receivables and (ii) one hundred and twenty (120) days past the date of the original invoice therefore with respect to Extended Term Receivables; or

(h)    the account debtor is the United States of America or any department, agency or instrumentality thereof, unless the Borrower assigns its right to payment under such account to the Agent as collateral hereunder in full compliance with (including, without limitation, the filing of a written notice of the assignment and a copy of the assignment with, and receipt of acknowledgment thereof by, the appropriate contracting and disbursing offices pursuant to) the Assignment of Claims Act of 1940, as amended (U.S.C. §§ 203, 3727; 41 U.S.C. § 5); or

(i)    the Agent believes, in its Permitted Discretion, that collection of such Receivable is insecure or that such Receivable may not be paid by reason of the account debtor's inability or unwillingness to pay; or

(j)    such Receivable consists of progress billings (such that the obligation of the account debtors with respect to such Receivable is conditioned upon the Borrower's satisfactory completion of any further performance under the agreement giving rise thereto), bill and hold invoices or retainage invoices, except as to bill and hold invoices, if the Agent shall have received an agreement in writing from the account debtor, in form and substance satisfactory to the Agent, confirming the unconditional obligation of the account debtor to take the goods related thereto and pay such invoice; or

(k)    such Receivables of a single account debtor aggregate more than 35% of all Eligible Receivables (but in each case the portion of such Receivables not in excess of such amount may be deemed to be Eligible Receivables); or

(l)    the account debtor is located in a state requiring the filing of a Notice of Business Activities Report or similar report in order to permit the Borrower to seek judicial enforcement in such State of payment of such Account, unless the Borrower has qualified to do business in such state or has filed a Notice of Business Activities Report or equivalent report for the then current year or such failure to file and inability to seek judicial enforcement is capable of being remedied without any material delay or material cost.

"Environmental Laws" means all federal, state and local statutes, laws (including common or case law), rulings, regulations or governmental, administrative or judicial policies, directives, orders or interpretations applicable to the business or property of a Person relating to pollution or protection of human health or the environment (including, without limitation, ambient air, surface water, ground water, land surface or subsurface strata) including, without limitation, laws and regulations relating to emissions, discharges, releases or threatened releases of Hazardous Materials, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of any Hazardous Materials.

"Equipment" means all now owned or hereafter acquired machinery, equipment, furniture, fixtures, leasehold improvements, conveyors, tools, materials, storage and handling equipment, hydraulic presses, cutting equipment, computer equipment, data processing equipments, software (including embedded software) and hardware, including central processing units, terminals, drives, memory units, embedded computer programs and supporting information, printers, keyboards, screens, peripherals and input or output devices, molds, dies, stamps, and other equipment of every kind and nature and wherever situated now or hereafter owned by a Person or in

which a Person may have any interest as lessee or otherwise (to the extent of such interest), together with all additions and accessions thereto, all replacements and all accessories and parts therefor, all manuals, blueprints, know-how, warranties and records in connection therewith and all rights against suppliers, warrantors, manufacturers, and sellers or others in connection therewith, together with all substitutes for any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. 1000 et seq., amendments thereto, successor statutes, and regulations or guidelines promulgated thereunder.

"ERISA Affiliate" means any entity required to be aggregated with the Borrower under Section 414(b), (c), (m) or (o) of the Internal Revenue Code.

"Event of Default" means the occurrence of any of the events specified in Section 9.1.

"Excess Availability" means the amount, as determined by the Agent with respect to the Borrower calculated at any time, equal to (a)(i) the Revolving A Availability, plus (ii) the Revolving B Availability, minus (b)(i) the aggregate amount of all then outstanding and unpaid trade payables and other obligations of the Borrower which are more than 30 days past due as of such time, plus (ii) the amount of checks issued by the Borrower to pay trade payables and other obligations which are more than 30 days past due as of such time, but not yet sent (but without duplication of clause (b)(i) and the book overdraft of the Borrower).

"Expiration Date" means the earliest of (i) May 12, 2005, (ii) the date of termination of all of the Commitments, (iii) the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of a plan of reorganization in the Chapter 11 Cases that has been confirmed by an order of the Bankruptcy Court, and (iv) the date which is 40 days after the Interim Facility Effective Date (or such later date that is mutually acceptable to the Agent, the Lenders and the Borrower) if the Final Bankruptcy Court Order has not been entered by the Bankruptcy Court on or prior to such date.

"Extended Term Receivables" means those Receivables of Borrower for which Borrower at the time of creation thereof permitted payment thereof on terms greater than thirty (30) days following original invoice date.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal, for each day during such period, to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day on such transactions received by the Agent from three Federal Funds brokers of recognized standing selected by it.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System or any Person succeeding to the functions thereof.

"Filing Date" has the meaning specified in the recitals hereto.

"Final Bankruptcy Court Order" means the final order of the Bankruptcy Court approving this Financing Agreement with respect to the Borrower and the Holding Company, substantially in the form of the Interim Bankruptcy Court Order, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Agent, the Required Lenders and the Borrower, which order shall be in full force and effect and not vacated, modified, amended (without the express written joinder or consent of the Required Lenders), renewed, overturned, subject to a pending appeal, or stayed in any respect, and, in the event such order is the subject of a pending appeal, the performance of any Obligation of any Loan Party shall not be stayed during such appeal.

"Final Bankruptcy Court Order Entry Date" means the date on which the Final Bankruptcy Court Order shall have been entered by the Bankruptcy Court.

"Final Facility Effective Date" means the first Business Day on which each of the conditions precedent set forth in Section 5.2 are satisfied in a manner satisfactory to the Agent and the Required Lenders.

"Final Period" means the period commencing on the Final Facility Effective Date and ending on the Expiration Date.

"Financial Covenants" means the covenants set forth in Article VIII.

"Financial Statements" means, with respect to the Borrower and its Subsidiaries, the balance sheets, profit and loss statements, statements of cash flow, and statements of changes in intercompany accounts, if any, for the period specified, prepared in accordance with GAAP and consistent with prior practices.

"Fortress" means Fortress Credit Corp., a Delaware corporation, and its successors and assigns.

"GAAP" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board that are applicable to the circumstances as of the date of determination.

"Governing Documents" means, with respect to any Person, the certificate of incorporation and bylaws or similar organizational documents of such Person.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof or any entity exercising executive, legislative, judicial, regulatory or administrative functions thereof or pertaining thereto.

"Guarantors" means the Holding Company and the Mexican Subsidiary.

"Guaranty" means collectively, the guaranty made by each Guarantor in favor of the Agent, substantially in the form of Exhibit C, as amended, supplemented or otherwise modified from time to time.

"Harper-Mex" means Harper-Mex S.A. de C.V., a corporation formed under the laws of Mexico.

"Hazardous Materials" means any and all pollutants, contaminants and toxic, caustic, radioactive and hazardous materials, substances and wastes including, without limitation, petroleum or petroleum distillates, asbestos or urea formaldehyde foam insulation or asbestos containing materials, whether or not friable, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature, that are regulated under any Environmental Laws.

"Hedging Agreement" means any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging agreement.

"Highest Lawful Rate" has the meaning specified in Section 11.10.

"Hilco" has the meaning specified in the introductory paragraph.

"Holding Company" means Appliance Controls Group Holdings, Inc., a Delaware corporation.

"Indebtedness" means, with respect to any Person, as of the date of determination thereof (without duplication), (i) all obligations of such Person for borrowed money of any kind or nature, including funded and unfunded debt, and any Hedging Agreements or arrangements therefor, regardless of whether the same is evidenced by any note, debenture, bond or other instrument, (ii) all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable under normal trade terms and which arise in the ordinary course of business), (iii) all obligations of such Person to acquire or for the acquisition or use of any fixed asset, including Capitalized Lease Obligations (other than, in any such case, any portion thereof representing interest or deemed interest or payments in respect of taxes, insurance, maintenance or service), or improvements which are payable over a period longer than one year, regardless of the term thereof or the Person or Persons to whom the same are payable, (iv) the then outstanding amount of withdrawal or termination liability incurred under ERISA, (v) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right to be secured) a Lien on any asset of such Person whether or not the Indebtedness is assumed by such Person, provided that for the purpose of determining the amount of Indebtedness of the type described in this clause (v), if recourse with respect to such Indebtedness is limited to the assets of such Person, then the amount of Indebtedness shall be limited to the fair market value of such assets, (vi) all Indebtedness of others to the extent guaranteed by such Person and (vii) all obligations of such Person in respect of letters of credit, bankers acceptances or similar instruments issued or accepted by banks or other financial institutions for the account of such Person.

"Indemnified Party" has the meaning specified in Section 11.4(a).

"Insolvency Event" means, with respect to any Person (other than the Borrower and the Holding Company), the occurrence of any of the following:  (i) such Person shall be adjudicated insolvent or bankrupt, subject to concurso mercantil, or institutes proceedings to be adjudicated insolvent or bankrupt, subject to concurso mercantil, or shall generally fail to pay or admit in writing its inability to pay its debts as they become due, (ii) such Person shall seek dissolution or

reorganization or concurso mercantil or the appointment of a receiver, trustee, custodian, conciliator or liquidator for it or a substantial portion of its property, assets or business or to effect a plan or other arrangement with its creditors, (iii) such Person shall make a general assignment for the benefit of its creditors, or consent to or acquiesce in the appointment of a receiver, trustee, custodian, conciliator or liquidator for a substantial portion of its property, assets or business, (iv) such Person shall file a voluntary petition under any bankruptcy, insolvency, concurso mercantil or similar law, (v) such Person shall take any corporate or similar act in furtherance of any of the foregoing, or (vi) such Person, or a substantial portion of its property, assets or business, shall become the subject of an involuntary proceeding or petition for (A) its dissolution or reorganization or (B) the appointment of a receiver, trustee, custodian, conciliator or liquidator, and (I) such proceeding is not dismissed or stayed within sixty days or (II) such receiver, trustee, custodian or liquidator is appointed; provided, however, that the Lender shall have no obligation to make any Loan during the pendency of any sixty-day period described in clauses (A) and (B).

"Intellectual Property" has the meaning specified in Section 6.1(y).

"Interest Expense" means, for any period, all interest with respect to Indebtedness (including, without limitation, the interest component of Capitalized Lease Obligations) accrued or capitalized during such period (whether or not actually paid during such period) determined in accordance with GAAP.

"Interim Bankruptcy Court Order" means the order of the Bankruptcy Court with respect to the Borrower and the Holding Company, substantially in the form of Exhibit D hereto, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Agent, the Required Lenders and the Borrower, which order shall be in full force and effect and not vacated, modified, amended (without the express written joinder or consent of Required Lenders), overturned, subject to a pending appeal, or stayed in any respect, and, in the event such order is the subject of a pending appeal, the performance of any Obligation of any Loan Party shall not be stayed during such appeal.

"Interim Bankruptcy Court Order Entry Date" means the date on which the Interim Bankruptcy Court Order shall have been entered by the Bankruptcy Court.

"Interim Facility Effective Date" means the date, on or before May 14, 2004, on which all of the conditions precedent set forth in Section 5.1 are satisfied and the initial Loans are made.

"Interim Period" means the period commencing on the Interim Facility Effective Date and ending on the earlier to occur of (i) the Final Facility Effective Date and (ii) the Expiration Date.

"Internal Revenue Code" means the Internal Revenue Code of 1986, any amendments thereto, any successor statute and any regulations and guidelines promulgated thereunder.

"Internal Revenue Service" or "IRS" means the United States Internal Revenue Service and any successor agency.

"Inventory" means all "inventory", as such term is defined in the UCC, now owned or hereafter acquired by Borrower, wherever located, and in any event including all present and future goods intended for sale, lease or other disposition including, without limitation, all raw materials, work in process, finished goods and other retail inventory, goods in the possession of outside processors or other third parties, goods held under a contract of service, consigned goods (to the extent of the consignee's interest therein), materials and supplies of any kind, nature or description which are or might be used in connection with the manufacture, packing, shipping, advertising, selling or finishing of any such goods, all documents of title or documents representing the same and all records, files and writings with respect thereto.

"Investment" in any Person means, as of the date of determination thereof, (i) any payment or contribution, or commitment to make a payment or contribution, by a Person including, without limitation, property contributed or committed to be contributed by such Person for or in connection with its acquisition of any stock, bonds, notes, debentures, partnership or other ownership interest or any other security of the Person in whom such Investment is made or (ii) any loan, advance or other extension of credit or guaranty of or other surety obligation for any Indebtedness of such Person in whom the Investment is made. In determining the aggregate amount of Investments outstanding at any particular time, (i) a guaranty (or other surety obligation) shall be valued at not less than the principal amount outstanding of the primary obligation; (ii) returns of capital (but only by repurchase, redemption, retirement, repayment, liquidating dividend or liquidating distribution) shall be deducted; (iii) earnings, whether as dividends, interest or otherwise, shall not be deducted; and (iv) decreases in the market value shall not be deducted unless such decreases are computed in accordance with GAAP.

"Investment Property" means all present and future investment property, including without limitation, all (i) securities, whether certificated or uncertificated, and including stocks, bonds, debentures, notes, bills, certificates, warrants, options, rights and shares, (ii) security entitlements, (iii) securities accounts, (iv) commodity contracts, (v) commodity accounts and (vi) dividends and other distributions in respect of any of the foregoing.

"Items of Payment" has the meaning specified in Section 2.7.

"Jacobson Management Agreement" means the Financial Advisory Services Agreement dated as of May 31, 2002 by and between Borrower and Jacobson Partners.

"Jacobson Partners" means Jacobson Partners, a New York general partnership.

"Lender" or "Lenders" has the meaning specified in the introductory paragraph hereof and shall include the Agent to the extent of any Agent Loan outstanding.

"Liabilities" of a Person as of the date of determination thereof means the liabilities of such Person on such date as determined in accordance with GAAP. Liabilities to Affiliates of such Person shall be treated as Liabilities except where eliminated by consolidation in financial statements prepared in accordance with GAAP or as otherwise provided herein.

"Lien" means any lien, claim, charge, pledge, security interest, assignment, hypothecation, deed of trust, mortgage, lease, conditional sale, retention of title, trust (fideicomiso)

arrangement or other preferential arrangement having substantially the same economic effect as any of the foregoing, whether voluntary or imposed by law.

"Loan Account" has the meaning specified in Section 2.6.

"Loan Documents" means this Agreement and all documents and instruments to be delivered by the Borrower or any of its Affiliates or any other Loan Party under or in connection with this Agreement, as each of the same may be amended, supplemented or otherwise modified from time to time, including, without limitation, the Interim Bankruptcy Court Order, the Final Bankruptcy Court Order, the Pledge Agreement, the Notes and the Guaranty.

"Loan Party" means the Borrower and each Guarantor.

"Loans" means the loans and financial accommodations made by the Agent or the Lenders hereunder including, without limitation, the Revolving Credit A Loans, the Revolving Credit B Loans, the Term Loan and the Agent Loans.

"Material Adverse Effect" means (i) a material adverse effect on the business, prospects, operations, results of operations, assets, liabilities or condition (financial or otherwise) of a Loan Party, except for the commencement of the Chapter 11 Cases and events (including defaults under pre-petition credit facilities) that would typically result from the commencement of the Chapter 11 Cases, (ii) the impairment of (A) a Loan Party's ability to perform its obligations under the Loan Documents to which it is a party or (B) the ability of the Agent or the Lenders to enforce the Obligations or realize upon the Collateral or (iii) a material adverse effect on the value of the Collateral or the amount that the Agent or the Lenders would be likely to receive (after giving consideration to delays in payment and costs of enforcement) in the liquidation of the Collateral.

"Material Contract" means any contract or other arrangement to which a Loan Party is a party (other than the Loan Documents) for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect.

"Material Indebtedness" means Indebtedness (other than the Loans), or obligations in respect of one or more Hedging Agreements, of any Loan Party in an aggregate principal amount exceeding $250,000. For purposes of this definition, the "principal amount" of the obligations of any Loan Party in respect of any Hedging Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that such Loan Party would be required to pay if such Hedging Agreement were terminated at such time.

"Maximum Revolver Amount" means Nine Million Dollars ($9,000,000).

"Maximum Credit Amount" means Fourteen Million Six Hundred Thousand Dollars ($14,600,000).

"Mexican M&E" means all Equipment of the Borrower and the Mexican Subsidiary that is located in Mexico and all proceeds thereof.

"Mexican Subsidiary" means Harper-Mex.

"Multiemployer Plan" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate has contributed within the past six years or with respect to which the Borrower or any ERISA Affiliate may incur any liability.

"Net Cash Proceeds" means, the aggregate cash proceeds received by any Loan Party in respect of (i) any sale or issuance of equity securities of such Loan Party and (ii) any sale or other disposition of assets of such Loan Party, in each case net of (without duplication) (A) the amount required to repay any Indebtedness (other than the Loans) under Capitalized Lease Obligations incurred with respect to, or secured by a Permitted Priority Lien on, any assets of a Loan Party that are sold or otherwise disposed of in connection with such asset sale, (B) the reasonable out-of-pocket expenses incurred in effecting such issuance, sale or other disposition and (C) any taxes reasonably attributable to such asset sale and reasonably estimated by such Loan Party to be actually payable.

"Notes" means the Revolving Credit A Notes (if any), the Revolving Credit B Notes (if any) and the Term Notes (if any).

"Notice of Borrowing" has the meaning specified in Section 2.3(a).

"Obligations" means and includes all loans (including the Loans), advances (including the Loans), debts, liabilities, obligations, covenants and duties owing by the Loan Parties to the Agent or the Lenders of any kind or nature, present or future, whether or not evidenced by any note, guaranty or other instrument, which may arise under, out of, or in connection with, this Agreement, the Notes, the other Loan Documents or any other agreement executed in connection herewith or therewith, whether or not for the payment of money, whether arising by reason of an extension of credit, opening, guaranteeing or confirming of a letter of credit, loan, guaranty, indemnification or in any other manner, whether direct or indirect (including those acquired by assignment, purchase, discount or otherwise), whether absolute or contingent, due or to become due, and however acquired. The term includes, without limitation, all interest, charges, expenses, commitment, facility, closing and collateral management fees, letter of credit fees, attorneys' fees, and any other sum properly chargeable to the Borrower under this Agreement, the Notes, the other Loan Documents or any other agreement executed in connection herewith or therewith.

"Original Closing Date" has the meaning specified in the recitals hereto.

"Original DIP Order" means the Interim Order of the Bankruptcy Court (1) Authorizing Incurrence of Indebtedness with Administrative Super-Priority and Secured by Senior Liens on and Security Interests in substantially All Assets of the Debtors pursuant to Sections 364(c)(1), (2) and (3) of the Bankruptcy Code, (2) granting Adequate Protection and Other Relief and (3) Scheduling and Approving the Form and Method of Notice of the Hearing on the Debtors' Motion to Incur such Financing on a Permanent Basis, entered by the Bankruptcy Court on April 13, 2004.

"Other Taxes" has the meaning specified in Section 4.10(b).

"Participant" has the meaning specified in Section 11.7(e).

"PBGC" means the Pension Benefit Guaranty Corporation and any Person succeeding to the functions thereof.

"Pension Plan" means a pension plan (as defined in Section 3(2) of ERISA) subject to Title IV of ERISA (other than a Multiemployer Plan) which the Borrower or any ERISA Affiliate sponsors or maintains, or to which it makes, is making, or is obligated to make contributions, or in the case of a multiple employer plan (as described in Section 4064(a) of ERISA) has made contributions at any time during the immediately preceding five plan years.

"Period" means the Interim Period or the Final Period.

"Permitted Discretion" means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"Permitted Liens" means such of the following as to which no enforcement, collection, execution, levy or foreclosure proceeding shall have been commenced and be continuing (unless such enforcement, collection, levy or foreclosure is being contested by the Borrower in good faith by appropriate proceedings diligently conducted and for which adequate reserves are being maintained in accordance with GAAP, or as to which enforcement is stayed under the Bankruptcy Code or pursuant to orders of the Bankruptcy Court): (i) Liens for taxes, assessments and other governmental charges or levies or the claims or demands of landlords, carriers, warehousemen, mechanics, laborers, materialmen and other like Persons arising by operation of law in the ordinary course of business for sums which are not yet due and payable, (ii) deposits or pledges (other than Liens on Receivables of the Borrower) to secure the payment of worker's compensation, unemployment insurance or other social security benefits or obligations, public or statutory obligations, surety or appeal bonds, bid or performance bonds or other obligations of a like nature incurred in the ordinary course of business, (iii) zoning restrictions, easements, encroachments, licenses, restrictions or covenants on the use of any Property, together with all exceptions noted on Schedule B of any mortgagee's title insurance policy delivered to the Lenders at the Closing in accordance with the terms of this Agreement, which do not materially impair either the use of such Property in the operation of the business of the Borrower or the value of such Property, (iv) inchoate Liens arising under ERISA to secure current service pension liabilities as they are incurred under the provisions of employee benefit plans from time to time in effect, (v) rights of general application reserved to or vested in any Governmental Authority to control or regulate any Property, or to use any Property in a manner which does not materially impair the use of such Property for the purposes for which it is held by the Borrower, (vi) leasehold interests with respect to property having an aggregate fair market value not to exceed $500,000 (at time of commissioning), (vii) Liens granted to the Pre-Petition Term Lender pursuant to the Pre-Petition Term Loan Documents; provided that the foregoing Liens under clauses (i) through (v) hereof do not secure liabilities in excess of $500,000 in the aggregate at any time, and provided, further that Permitted Liens[, other than the Liens under clause (vii) hereof,] shall not include any Lien securing Indebtedness.

"Permitted Priority Lien" shall mean any valid, perfected non-avoidable Permitted Lien existing on the Filing Date; provided, however, that the term "Permitted Priority Lien" shall not include the Liens described in clauses (i), (iii), (vi) and (vii) (other than Liens on the Mexican

M&E granted to the Pre-Petition Term Lender prior to the Filing Date) of the definition of the term "Permitted Liens".

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, joint stock company, association, corporation, institution, entity, party or government (including any division, agency or department thereof) or any other legal entity, whether acting in an individual, fiduciary or other capacity, and, as applicable, the successors, heirs and assigns of each.

"Plan" means any employee benefit plan, as defined in Section 3(3) of ERISA, maintained or contributed to by the Borrower or any ERISA Affiliate or with respect to which any of them may incur liability even if such plan is not covered by ERISA pursuant to Section 4(b)(4) thereof.

"Pledge Agreement" means collectively, the pledge agreements executed by the Holding Company and the Borrower in favor of the Agent, substantially in the form of Exhibit E, as each may be amended, supplemented or otherwise modified from time to time.

"Pre-Petition Revolving Agent" means Transamerica Business Credit Corporation, in its capacity as agent to the Pre-Petition Revolving Lenders under the Pre-Petition Revolving Loan Agreement.

"Pre-Petition Revolving Lenders" means the lenders party to the Pre-Petition Revolving Loan Agreement.

"Pre-Petition Revolving Loan Agreement" means the Loan and Security Agreement, dated as of June 21, 2002, among the Borrower, each of the Pre-Petition Revolving Lenders and the Pre-Petition Revolving Agent, as amended or otherwise modified prior to the date hereof.

"Pre-Petition Term Lender" means Hilco and its successors and assigns.

"Pre-Petition Term Loan Agreement" means the Loan and Security Agreement, dated as of July 26, 2002, among the Borrower, the Guarantors and Pre-Petition Term Lender, as amended or otherwise modified prior to the date hereof.

"Pre-Petition Term Loan Documents" means the Pre-Petition Term Loan Agreement and all other notes, documents, agreements and instruments executed prior to the date hereof in connection therewith.

"Pricing Increment" means (a) 4% per annum for Loans comprising all or a part of the Revolving Credit A Loans, (b) 13% per annum for Loans comprising all or a part of the Revolving Credit B Loans and (c) 9% per annum for Loans comprising all or a part of the Term Loan.

"Priority Professional Expenses" means those expenses entitled to a priority as set forth in sub-clause (ii) of the clause "first" of the definition of the term "Agreed Administrative Expense Priorities".

"Pro Rata Share" means:

(a)    with respect to a Lender's obligation to make Revolving Credit A Loans, to receive payments of interest, fees, and principal with respect thereto, and to determine such Lender's Pro Rata Share of Agent Loans, the percentage obtained by dividing (i) such Lender's Revolving A Credit Commitment, by (ii) the Total Revolving A Credit Commitment, provided, that, if the Total Revolving A Credit Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Lender's Revolving Credit A Loans and the denominator shall be the aggregate unpaid principal amount of all Revolving Credit A Loans (including an aggregate amount equal to the Revolving Credit A Lenders' Pro Rata Shares (as determined by clause (d) hereof) of the Agent Loans);

(b)    with respect to a Lender's obligation to make Revolving Credit B Loans and receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (i) such Lender's Revolving B Credit Commitment, by (ii) the Total Revolving B Credit Commitment, provided, that, if the Total Revolving B Credit Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Lender's Revolving B Loans and the denominator shall be the aggregate unpaid principal amount of all Revolving Credit B Loans (including an aggregate amount equal to the Revolving Credit B Loan Lenders' Pro Rata Shares (as determined by clause (d) hereof) of the Agent Loans);

(c)    with respect to a Lender's obligation to make the Term Loan and receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (i) such Lender's Term Loan Commitment, by (ii) the Total Term Loan Commitment, provided that if the Total Term Loan Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Lender's portion of the Term Loan and the denominator shall be the aggregate unpaid principal amount of the Term Loan; and

(d)    with respect to all other matters, the percentage obtained by dividing (i) the sum of such Lender's Revolving A Credit Commitment and Revolving B Credit Commitment and the unpaid principal amount of such Lender's portion of the Term Loan, by (ii) the sum of the Total Revolving A Credit Commitment, the Total Revolving B Credit Commitment and the aggregate unpaid principal amount of the Term Loan, provided that if such Lender's Revolving A Credit Commitment or Revolving B Credit Commitment shall have been reduced to zero, such Lender's Revolving A Credit Commitment or Revolving B Credit Commitment, as the case may be, shall be deemed to be the aggregate unpaid principal amount of such Lender's Revolving Credit A Loans (including such Lender's Pro Rata Share of Agent Loans (as determined by clause (a) above) or Revolving Credit B Loans, as the case may be.

"Prohibited Transaction" has the meaning specified in Section 6.1(x)(v).

"Property" means any real property owned, leased or controlled by the Borrower or any Subsidiary of the Borrower including, without limitation, the real property located at 525 Elm Place, Princeton, Illinois.

"Qualification" or "Qualified" means, with respect to any report of independent public accountants covering Financial Statements, a material qualification to such report

(i) resulting from a limitation on the scope of examination of such Financial Statements or the underlying data, (ii) as to the capability of the Borrower or any other Loan Party to continue operations as a going concern or (iii) which could be eliminated by changes in Financial Statements or notes thereto covered by such report (such as by the creation of or increase in a reserve or a decrease in the carrying value of assets) and which if so eliminated by the making of any such change and after giving effect thereto would result in a Default or an Event of Default.

"Receivables" means all present and future accounts, contracts, contract rights, promissory notes, chattel paper (including tangible and electronic chattel paper), documents, tax refunds, rights to receive tax refunds, bonds, certificates, insurance policies (including, without limitation, claims under health care insurance policies), insurance proceeds, patents, patent applications, copyrights (registered and unregistered), royalties, licenses, permits, franchise rights, authorizations, customer and supplier lists, rights of indemnification, contribution and subrogation, leases, computer tapes, programs, discs and software, trade secrets, computer service contracts, trademarks (including any goodwill associated with any trademark or the license of any tradename), trade names, service marks, service names, domain names, logos, goodwill, deposits, causes of action (including, without limitation, commercial tort claims), choses in action, judgments, designs, blueprints, plans, know-how, all other general intangibles (including, without limitation, payment intangibles), claims against third parties of every kind or nature, drafts, acceptances, letters of credit, letter-of-credit rights, rights to receive payments under letters of credit, book accounts, deposit and other accounts and all money, balances, credits, deposits or other financial assets therein or represented thereby, commercial tort claims, health care insurance receivables, supporting obligations, credits and reserves and all forms of obligations whatsoever owing, instruments, documents of title, leasehold rights in any goods, and books, ledgers, files and records with respect to any collateral or security, together with all supporting obligations and all right, title, security and guaranties with respect to any of the foregoing, including any right of stoppage in transit.

"Register" has the meaning specified in Section 11.7(d).

"Replacement Lender" means a financial institution proposed by the Borrower in accordance with Section 2.10(d) that is satisfactory to the Agent in its sole discretion and which has agreed to acquire and assume all or a part of a Defaulting Lender's Loans and Commitments under Section 2.10(d)

"Replacement Notice" has the meaning specified in Section 2.10(d).

"Reportable Event" means any of the events described in Section 4043 of ERISA and the regulations thereunder, other than the commencement of the Chapter 11 Cases and a reportable event for which the thirty-day notice requirement to the PBGC has been waived.

"Required Lenders" means (a) Fortress and Hilco and (b)(i) before the Expiration Date, the Lenders holding more than fifty percent of the aggregate Commitments at such time and (ii) on and after the Expiration Date, the Lenders holding more than fifty percent of the aggregate unpaid principal amount of the Loans at such time.

"Requirement of Law" means (i) the Governing Documents, (ii) any law, treaty, rule, regulation, order or determination of an arbitrator, court or other Governmental Authority or

(iii) any franchise, license, lease, permit, certificate, authorization, qualification, easement, right of way, or other right or approval binding on a Loan Party or any of its property.

"Responsible Officer" means the President, the Chief Restructuring Officer or the Chief Operating Officer of a Loan Party.

"Revolving A Availability" means, at any time, the positive amount (if any) equal to (i) the lesser of (A) the Borrowing Base and (B) the Total Revolving A Credit Commitment minus (ii) the aggregate outstanding principal amount of the Revolving Credit A Loans.

"Revolving A Credit Commitment" means, with respect to each Lender, the commitment of such Lender to make Loans to the Borrower in the amount set forth opposite such Lender's name in Schedule 1 hereto, as such amount may be terminated or reduced from time to time in accordance with the terms of this Agreement.

"Revolving B Availability" means, at any time, the positive amount (if any) equal to (i) the Total Revolving B Credit Commitment minus (ii) the aggregate outstanding principal amount of Revolving Credit B Loans; provided that, in the event that Revolving A Availablility is at least $1, Revolving B Availability shall be deemed to be zero ($0).

"Revolving B Credit Commitment" means, with respect to each Lender, the commitment of such Lender to make Revolving Credit B Loans to the Borrower in the amount set forth opposite such Lender's name in Schedule 1 hereto, as such amount may be terminated or reduced from time to time in accordance with the terms of this Agreement.

"Revolving Credit A Loan" means a loan made by a Lender to the Borrower pursuant to Section 2.1(a)(i).

"Revolving Credit A Loan Lender" means a Lender with a Revolving A Credit Commitment or a Revolving Credit A Loan.

"Revolving Credit A Note" has the meaning specified in Section 2.1(d)(i).

"Revolving Credit B Loan" means a loan made by a Lender to the Borrower pursuant to Section 2.1(a)(ii).

"Revolving Credit B Loan Lender" means a Lender with a Revolving B Credit Commitment or a Revolving Credit B Loan.

"Revolving Credit B Note" has the meaning specified in Section 2.1(d)(ii).

"Revolving Credit Loans" means the Revolving Credit A Loans and the Revolving Credit B Loans.

"Sale Order" has the meaning specified in Section 9.1(aa).

"Securities Account" has the meaning specified in Section 8-501 of the Code.

"Settlement" has the meaning specified in Section 2.3(i).

"Settlement Date" has the meaning specified in Section 2.3(i).

"Stock" has the meaning specified in Section 7.2(j).

"Subsidiary" means, as to any Person, a corporation or other entity in which that Person directly or indirectly owns or controls the shares of stock or other ownership interests having ordinary voting power to elect a majority of the board of directors or other governing body, or to appoint the majority of the managers of, such corporation or other entity.

"Taxes" has the meaning specified in Section 4.10(a).

"Term Loan" means a loan made by a Term Loan Lender to the Borrower pursuant to Section 2.2(a).

"Term Loan Commitment" means, with respect to each Lender, the commitment of such Lender to make a Term Loan to the Borrower in the amount set forth opposite such Lender's name in Schedule 1 hereto, as such amount may be terminated or reduced from time to time in accordance with the terms of this Agreement.

"Term Loan Lender" means a Lender with a Term Loan Commitment or a Term Loan.

"Term Note" has the meaning specified in Section 2.2(b).

"Termination Event" means (i) a Reportable Event with respect to any Pension Plan or Multiemployer Plan; (ii) the withdrawal of the Borrower or any ERISA Affiliate from a Pension Plan during a plan year in which it was a "substantial employer" (as defined in Section 4001(a)(2) of ERISA); (iii) the providing of notice of intent to terminate a Pension Plan in a distress termination (as described in Section 4041(c) of ERISA); (iv) the institution by the PBGC of proceedings to terminate a Pension Plan or Multiemployer Plan; (v) any event or condition (A) which is reasonably likely to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan, or (B) that is reasonably likely to result in termination of a Multiemployer Plan pursuant to Section 4041A of ERISA; or (vi) the partial or complete withdrawal, within the meaning of Sections 4203 and 4205 of ERISA, of the Borrower or any ERISA Affiliate from a Multiemployer Plan; provided, however, that no Termination Event shall be deemed to have occurred as a result of the Chapter 11 Cases.

"Total Commitment" means, for any Period, the sum of the Total Revolving A Credit Commitment, the Total Revolving B Credit Commitment and the Total Term Loan Commitment.

"Total Revolving A Credit Commitment" means the sum of the Revolving A Credit Commitments.

"Total Revolving B Credit Commitment" means the sum of the Revolving B Credit Commitments.

"Total Term Loan Commitment" means the sum of the Term Loan Commitments.

Section 1.2    Accounting Terms and Determinations. Unless otherwise defined or specified herein, all accounting terms used in this Agreement shall be construed in accordance with GAAP, applied on a basis consistent in all material respects with the Financial Statements delivered to the Agent on or before the Closing Date. All accounting determinations for purposes of determining compliance with Article VIII shall be made in accordance with GAAP as in effect on the Closing Date and applied on a basis consistent in all material respects with the Financial Statements delivered to the Agent on or before the Closing Date. The Financial Statements required to be delivered hereunder from and after the Closing Date, and all financial records, shall be maintained in accordance with GAAP.

Section 1.3    Other Terms; Headings. Unless otherwise defined herein, terms used herein that are defined in the Uniform Commercial Code, from time to time in effect in the State of Illinois (the "Code"), shall have the meanings given in the Code. An Event of Default shall "continue" or be "continuing" unless and until such Event of Default has been waived or cured within any grace period specified therefor under Section 9.1. The headings and the Table of Contents are for convenience only and shall not affect the meaning or construction of any provision of this Agreement. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein or in any other Loan Document shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (v) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

## ARTICLE II
## THE CREDIT FACILITIES

Section 2.1    The Revolving Credit Loans. (a) Subject to the terms and conditions and relying upon the representations and warranties herein set forth:

(i)    each Revolving Credit A Loan Lender severally agrees to make its Pro Rata Share of Revolving Credit A Loans to the Borrower at any time and from time to time from the Effective Date to the Expiration Date, or until the earlier reduction of its Revolving A Credit Commitment to zero in accordance with the terms hereof, in an aggregate principal amount of Revolving Credit A Loans at any time outstanding not to exceed the amount of such Lender's Revolving A Credit Commitment; and