## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **In re** | :    **Chapter 11** |
| | : |
| **APPLIANCE CONTROLS GROUP,** | :    **Jointly Administered** |
| **HOLDINGS, INC. and APPLIANCE** | : |
| **CONTROLS GROUP, INC.,** | :    **Case No.  04-14517** |
| | :    **Hon. A. Benjamin Goldgar** |
| | : |
| **Debtors.** | : |

## AGREED FINAL ORDER AUTHORIZING THE DEBTORS TO ENTER INTO POSTPETITION FINANCING AGREEMENT AND OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, AND 364 OF THE BANKRUPTCY CODE, AND GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS

THIS MATTER having been originally heard on the Motion (the "Motion") of Appliance Controls Group, Inc. ("ACG") and Appliance Controls Group Holdings, Inc. ("Holdings"), as debtors and debtors-in-possession herein (each a "Debtor" and collectively, the "Debtors"), for the entry of an interim order the "Interim Order") authorizing them to incur post-petition secured indebtedness, to grant security interests and superpriority claims pursuant to sections 105(a) and 364 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); the Court having entered the Interim Order on or about May 12, 2004; the matter having been set for final hearing (the "Final Hearing") on June 9, 2004; and the Motion having sought the following relief:

(a)      the Court's authorization, pursuant to sections 105(a) and 364(c) and (d) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014, for ACG, as Borrower

(individually and collectively, jointly and severally, the "Borrower"), and Holdings and certain

other subsidiaries and affiliates, as Guarantors for the Borrower, to obtain from Hilco Capital, LP

("Hilco"), as collateral agent and administrative agent (each an "Agent" and, collectively, the

"Agents") acting for themselves, as lenders, and as Agents for Fortress Credit Corp. (by itself or

together with one or more of its affiliates "Fortress") and other lenders that may, on the effective

date of this order, and from time to time thereafter become lenders (Hilco and Fortress in their

capacity as lenders, together with such other lenders and the Agents, collectively, the "DIP

Lenders"), cash advances, and other extensions of credit consisting of (a) a revolving A credit

facility in an aggregate principal amount not to exceed $8,000,000 at any time outstanding,

subject to borrowing base limitations, (b) a revolving B credit facility in an aggregate principal

amount not to exceed $1,000,000 at any time outstanding, and (c) a term loan facility in the

aggregate principal amount not to exceed $5,600,000 (which loans and advances were limited to

$13,500,000 until the Final Order (as hereinafter defined) shall have been entered by the

Bankruptcy Court), as provided in the DIP Loan Documents (the loans under such facilities, the

"DIP Loans"), pursuant to a Post-Petition Loan and Security Agreement substantially in the form

annexed to the Interim Order as Exhibit "A", and as amended, modified or supplemented from

time to time, the "DIP Loan Agreement",[1] by and among the Debtors, the DIP Lenders and the

Agents. The proceeds of the DIP Loans made under the credit facilities shall be used (i) to

refinance (A) a substantial portion of the existing pre-petition Obligations of the Borrower,

Holdings, and their direct and indirect subsidiaries under the (1) Pre-Petition Revolving Loan

Agreement and (2) the Pre-Petition Term Loan Agreement (collectively, the "Pre-Petition

---

[1]    Unless otherwise defined herein, capitalized terms shall have the meanings as defined in the DIP
Loan Agreement.

{A0066712.DOC 4}

Obligations") and (B) all existing post-petition Obligations under the Original DIP Order, after

the entry of this Interim Order, (ii) for general working capital requirements and other general

corporate purposes of the Borrower, Holdings, and their direct and indirect subsidiaries during

their chapter 11 cases (the "Chapter 11 Cases"), (iii) to pay fees and expenses related to the DIP

Loan Agreement, (iv) to pay the fees, costs, expenses, and disbursements of professionals

retained by the Debtors or any statutory committee(s) appointed in the Chapter 11 Cases

pursuant to section 1102 of the Bankruptcy Code (the "Committee(s)"), (v) to pay the costs and

expenses of members of any Committees as approved by the Court, to pay other bankruptcy

related charges all as allowed by the Court, including UST/Clerk Fees (defined herein) subject to

the terms of this Final Order, and (vi) and to pay any fees, deposits and expenses (including,

without limitation, reasonable attorneys' fees and expenses) owed to the DIP Lenders or the

Agents, or otherwise required, under the DIP Loan Agreement and the other agreements,

instruments and other documents executed in connection therewith (collectively, with the DIP

Loan Agreement, the "DIP Loan Documents");

    (b)    the Court's ordering, pursuant to sections 364(c)(1) and (2) and 364(d)(1) of the

Bankruptcy Code, that the Obligations of the Debtors under the DIP Loan Documents

(collectively, the "DIP Obligations") are:

    i.    granted superpriority administrative expense claim status, having priority over any and all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(b), 506 (c), 507, 546(c), 726 and 1114, but subject to (x)Bankruptcy during the occurrence and continuance of an Event of Default or a default hereunder, the payment of Priority Professional Expenses up to the Carve-Out Amount (defined below) and (y) UST/Clerk Fees (defined below);

    ii.    secured under section 364(c)(2) by a first priority, perfected lien on and security interest in all pre-petition and post-petition property of the Debtors, of whatever kind or nature, whether existing on the Filing Date or thereafter acquired, that, on or as of the Filing Date, is not subject to valid, perfected and non-avoidable Liens or to valid and non-avoidable Liens in

3

existence immediately prior to the Filing Date that are perfected subsequent to the Filing Date as permitted by Section 546(b) of the Bankruptcy Code, including, without limitation, by way of general description only, all property of the "estate" (within the meaning of the Bankruptcy Code), and all accounts, inventory, goods, contract rights, instruments, documents, chattel paper, general intangibles, payment intangibles, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property, fixtures, leases, 100% of the capital Stock or other equity interests in any Subsidiary, money, investment property, deposit accounts, all commercial tort claims and all causes of action arising under the Bankruptcy Code or otherwise (excluding all Avoidance Actions, except to the extent provided in the Final Bankruptcy Court Order), and all cash and non-cash proceeds, rents, products and profits of any of the foregoing (collectively, the "Unencumbered Collateral"), subject only to (a) any Permitted Priority Liens, (b) during the occurrence and continuance of an Event of Default or a default hereunder, the payment of Priority Professional Expenses up to the Carve-Out Amount and (c) UST/Clerk Fees;

iii.        secured under section 364(d)(1) of the Bankruptcy Code by a first priority, perfected lien on and security interest in all pre-petition and post-petition property of the Debtors (but excluding the property described in clause (ii) as to which the liens and security interests in favor of the DIP Lenders and the Agents will be as described in such clause), whether now existing or hereafter acquired, that is subject to valid, perfected and non-avoidable Liens in existence immediately prior to the Filing Date or to valid and non-avoidable Liens in existence immediately prior to the Filing Date that are perfected subsequent to the Filing Date as permitted by Section 546(b) of the Bankruptcy Code (collectively, the "Secured Collateral" and, together with the Unencumbered Collateral, the "Collateral"), subject only to (a) any Permitted Priority Liens, (b) during the occurrence and continuance of an Event of Default or a default hereunder, the payment of Priority Professional Expenses up to the Carve-Out Amount and (c) UST/Clerk Fees; and

(c)      finding, pursuant to Bankruptcy Rule 4001(c)(1), that adequate notice of the Final

Hearing has been given to all parties entitled thereto (collectively, the "Notice Parties") and the

Debtors have represented to the Court that such notice was, in the Debtors' belief, the best

available under the circumstances; and based upon all of the pleadings filed with the Court, the

evidence presented at the Final Hearing and the entire record herein; and the Court having noted

the appearances of all parties in interest; and all objections to the relief requested in the Motion

having been resolved or overruled by the Court, and it appearing that the relief requested in the

Motion is in the best interests of the Debtors, their estates and creditors, and is essential for the

continued operations of the Debtors' businesses; and it further appearing that the Debtors are

unable to obtain unsecured credit for money borrowed allowable as an administrative expense

under section 503(b)(1) of the Bankruptcy Code or other secured financing on equal or more

favorable terms than those set forth in the DIP Loan Documents;

Based upon the above findings, the Court, having reviewed the Motion, considering the

arguments of counsel, and otherwise being fully advised, hereby Concludes and Orders as

follows:

**IT IS HEREBY ORDERED:** [2]

1.   <u>Disposition</u>.  The Motion is granted.  Any objections to the Motion that have not

previously been withdrawn are hereby overruled.  This Final Order shall be valid, binding on all

parties in interest and fully effective immediately upon entry.

2.   <u>Jurisdiction; Venue</u>.  The Court has jurisdiction over these cases, the parties and

the Debtors' property pursuant to 28 U.S.C. §1334.  This is a core proceeding pursuant to

28 U.S.C. §157(b)(2)(D).  Venue of the Chapter 11 Cases and the Motion is proper under 28

U.S.C. §§ 1408 and 1409.

3.   <u>Purpose and Necessity of Financing</u>.  The Debtors require the financing described

in the Motion to refinance certain of the Pre-Petition Obligations[3] and Obligations under the

---

[2]   Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

[3]   Of the approximately $6,331,350 outstanding amount of Pre-Petition Obligations owed to Hilco, the DIP Loan proceeds will be used to pay $5.6 million of those Obligations.

{A0066712.DOC 4}

Original DIP Order, and to fund, among other things, the Debtors' cash requirements for working capital and general corporate needs. If the Debtors do not obtain authorization to borrow under the DIP Loan Agreement and the DIP Loans are not approved, the Debtors will suffer immediate and irreparable harm. The DIP Loans will provide the Debtors with access to increased borrowing availability at a time when they are up to or near the maximum available under the prior DIP financing at an overall cost of funds lower than under the same. Further, an integral part of the prior DIP financing is the extremely tight time line for the sale process. Under the terms of the DIP Loan Agreement, the sale time line is substantially increased, thereby greatly improving the prospects for the realization of a higher value upon the sale of the Debtors' assets. The Debtors are unable to obtain adequate unsecured credit allowable under section 503 of the Bankruptcy Code as an administrative expense or other financing under sections 364(c) or (d) of the Bankruptcy Code on equal or more favorable terms than those set forth in the DIP Loan Documents within the time frame required by their needs to avoid immediate and irreparable harm. A loan facility in the amount provided by the DIP Loan Documents is not available to the Debtors without granting to the DIP Lenders pursuant to sections 364(c)(1) and (2), and 364(d) of the Bankruptcy Code, the following: (a) superpriority administrative claims with respect to the DIP Obligations having priority over any and all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726 and 1114, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (except as otherwise expressly provided for herein with respect to the rights of certain creditors to the proceeds of the Committee Claims as further detailed herein, the Priority Professional Expenses (up to the Carve-Out Amount after an Event of Default or a default hereunder) and

6

UST/Clerk Fees); (b) as security for all DIP Obligations (i) under section 364(c)(2) of the Bankruptcy Code, a first priority, perfected lien on and security interest in the Unencumbered Collateral, whether existing on the Filing Date or thereafter acquired, including all Avoidance Actions, subject to the terms of this Order, and all cash and non-cash proceeds, rents, products and profits of any of the foregoing, subject only to (A) any Permitted Priority Liens, (B) during the occurrence and continuance of an Event of Default or a default hereunder, the payment of Priority Professional Expenses up to the Carve-Out Amount, (C) UST/Clerk Fees, and (D) the rights of certain creditors to the proceeds of the Committee Claims as further detailed herein, and (ii) secured under section 364(d)(1) of the Bankruptcy Code, a first priority, perfected lien on and security interest in the Secured Collateral (but excluding the property described in clause (b)(i) as to which the liens and security interests in favor of the DIP Lenders and the Agents will be as described in such clause), whether now existing or hereafter acquired, subject only to (A) any Permitted Priority Liens, (B)~~certain potential~~ during the occurrence and continuance of an Event of Default or a default hereunder, the payment of Priority Professional Expenses up to the Carve-Out Amount and (C) UST/Clerk Fees. After considering all alternatives, the Debtors have concluded in the exercise of their prudent business judgment that the loan facility provided under the DIP Loan Documents represents the best financing available to them at this time.

4.    Good Cause. The ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Loan Documents is vital to the estates of the Debtors and their creditors, so that the Debtors can continue to operate their businesses in the ordinary course. The preservation of the going concern value of the Debtors' businesses pending a sale of substantially all of the Debtors' assets is the linchpin of any successful Chapter 11 case. The

7

Debtors' estates will be immediately and irreparably harmed if this Final Order is not entered. Good cause has, therefore, been shown for the relief sought in the Motion.

5.    <u>Good Faith</u>. The DIP Loan Documents and this Final Order have been negotiated in good faith and at arm's-length between the Debtors and the DIP Lenders. Any DIP Loans and/or other financial accommodations made to the Debtors by the DIP Lenders pursuant to this Final Order and the DIP Loan Agreement shall be deemed to have been extended by the DIP Lenders in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and the DIP Lenders shall be entitled to all protections afforded thereunder. The terms of the loan facility provided under the DIP Loan Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

6.    <u>Authorized Borrowing</u>. The Debtors are immediately authorized to obtain DIP Loans pursuant to the terms of the DIP Loan Documents and this Final Order in the amount of up to $14,600,000, consisting of (a) a revolving A credit facility in an aggregate principal amount not to exceed $8,000,000 at any time outstanding, subject to borrowing base limitations, (b) a revolving B credit facility in an aggregate principal amount not to exceed $1,000,000 at any time outstanding and (c) a term loan facility in the aggregate principal amount not to exceed $5,600,000, as provided in the DIP Loan Documents. Available financing and advances under the DIP Loan Agreement will be made to refinance certain of the Pre-Petition Obligations, the Obligations under the Original DIP Order, and to fund the Debtors' ordinary working capital and general corporate needs and other amounts required or allowed to be paid in accordance with this Final Order and the DIP Loan Documents. To the extent that (1) a Challenge (as that term is defined in this Court's order of April 13, 2004) respecting the claims and/or security

8

interests of Transamerica Business Credit Corporation ("Transamerica") or Hilco is not properly filed on or before the Challenge Deadline (as that term is defined in the Court's order of April 13, 2004) by such a party-in-interest or (2) if such a Challenge is so filed and Transamerica or Hilco ultimately prevail thereon (whether initially, on appeal or otherwise), the repayment of the Pre-Petition Obligations and the Transamerica Post Petition Obligations authorized and directed by the Interim Order shall constitute indefeasible payment of such indebtedness and shall be final for all purposes in this case and any subsequent proceedings under the Bankruptcy Code and shall be binding on all parties, including, without limitation, the Debtors, their estates, all creditors of the Debtors and all successors and assigns (including any trustee, examiner or responsible person in this or any subsequent proceeding under the Bankruptcy Code).

7.    Stipulations.    In providing for post-petition financing under the DIP Loan Agreement, the Debtors acknowledge, represent, stipulate and agree that:

(a)    subject to the terms of that certain Post-Closing Agreement, dated as of May 17, 2004, all of the Debtors have obtained all authorizations, consents and approvals necessary from, and have made all necessary filings with and given all necessary notices to, all federal, state and local governmental agencies, authorities and instrumentalities required to be obtained, made or given by the Debtors in connection with the execution, delivery, performance, validity and enforceability of the DIP Loan Documents to which any Debtor is a party;

(b)    in entering into the DIP Loan Documents, and except as otherwise provided herein, and as consideration therefor, the Debtors hereby agree that until such time as all DIP Obligations are indefeasibly paid in full, in cash, and the Commitments are terminated in accordance with the terms of the DIP Loan Agreement, the Debtors shall not in any way prime or

9

seek to prime (*i.e.*, cause to be subordinated) the liens provided to the DIP Lenders and the Agents under this Interim Order by offering a subsequent lender or any party-in-interest a superior or *pari passu* lien, interest or claim pursuant to section 364(d) of the Bankruptcy Code or otherwise;

(c)    all of the Debtors will receive and have received reasonable consideration in exchange for the making of the DIP Loans, and the other financial accommodations provided under the DIP Loan Documents and this Final Order; and

(d)    there are no other liens on or security interests in the Collateral except for the Permitted Liens.

8.    <u>Fees and Deposit</u>.    All fees paid and payable and costs and/or expenses reimbursed or reimbursable under the DIP Loan Documents and this Final Order by the Debtors to the DIP Lenders or the Agents (except for attorneys' fees and related costs which shall be reimbursed pursuant to the terms of this Order) are hereby approved.  The Debtors are hereby authorized and directed to pay all such fees, in accordance with the terms of the DIP Loan Documents and this Final Order, without the necessity of the Debtors, the DIP Lenders or the Agents filing any further application with the Court for approval or payment of such fees or expenses.  Upon payment of such fees, such fees shall be deemed fully earned and non-refundable.  The DIP Lenders shall seek reimbursement of their attorneys' fees and related costs by transmitting invoices, prepared by their respective counsel in the ordinary course of such counsel's billing practices, redacted to protect any privileged information, to counsel for the Debtors and counsel for the Committee.  Such invoices shall describe the services performed, the attorneys and paraprofessionals performing such services, their billing rates, the hours incurred and the fees and disbursements requested.  Debtors and the Committee shall have ten

10

(10) days to review the monthly invoices.  If there is no objection to the fees and reimbursements requested, at the end of the ten day period, Debtors shall pay one hundred percent (100%) of the requested fees and expenses.  In the event of an objection to the compensation or reimbursement sought in a particular invoice, a notice of objection shall be served on the requesting party, setting forth the precise nature of the objection and the amount at issue.  If the parties are unable to reach an agreement on the objection, the objecting party may file its objection with the court and serve notice of hearing thereon.  Any fees or expenses which are not subject to such objection shall be paid by the Debtors.

9.     <u>Authority to Execute and Deliver Necessary Documents</u>.  Each of the Debtors is authorized and empowered to enter into and deliver the DIP Loan Agreement and the other DIP Loan Documents in each case including any amendments thereto, and including UCC financing statements and mortgages or deeds of trust encumbering all of the Collateral and securing all of the Debtors' obligations under the DIP Loan Agreement, including repayment of all DIP Obligations.  Each of the Debtors is hereby further authorized and directed (a) to perform all of their obligations under the DIP Loan Documents and such other agreements as may be required by the DIP Loan Documents to give effect to the terms of the financing provided for in this Interim Order; (b) to perform all acts required under the DIP Loan Documents and this Final Order, including, without limitation, the payment of fees and the reimbursement of present and future reasonable costs and expenses (including without limitation, attorneys' fees and legal expenses which shall be reimbursed pursuant to Paragraph 8 of this Final Order) paid or incurred by the DIP Lenders or the Agents provided for in this Final Order, the DIP Loan Agreement and the other DIP Loan Documents, all of which unpaid fees, commissions, costs and expenses shall be included and constitute part of the principal amount of the DIP

{A0066712.DOC 4}

Obligations, and be secured by a first priority lien on and security interest in all of the Collateral, the DIP Loan Agreement and the other DIP Loan Documents; and (c) to do and perform all other acts, to make, execute and deliver all other instruments, agreements and documents, which may be reasonably requested by the DIP Lenders or the Agents. The obligations under the DIP Loan Documents and this Final Order shall constitute valid and binding obligations of each of the Debtors enforceable against each of them, and each of their successors and assigns, in accordance with their terms and the terms of this Final Order.

10.    Amendments.    The Debtors, with the express written consent of the requisite Lenders and/or the Agents as specified in the DIP Loan Agreement and the consent of the Committee, may enter into any amendments or modifications to the DIP Loan Agreement and the other DIP Loan Documents without the need of further notice and hearing or order of this Court, provided that such modifications or amendments do not materially adversely affect the rights of any creditor, equity holder or party in interest, and provided further, that notice of any such amendment shall be filed with the Court and served upon counsel to the Committee and the Office of the United States Trustee.

11.    Superpriority Claim and Lien Priority.

(a)    the DIP Lenders and the Agents are hereby granted an allowed superpriority administrative expense claim (the "Superpriority Claim") pursuant to section 364(c)(1) of the Bankruptcy Code for all of the DIP Obligations, having priority over any and all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726 and 1114, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, subject and subordinate in priority of payment only to the (x) the rights of certain creditors to the proceeds of

12

{A0066712.DOC 4}

the Committee Claims, as further detailed herein; (y) the Priority Professional Expenses (up to the Carve-Out Amount after an Event of Default or a default hereunder); and (z) the UST/Clerk Fees;

(b)    subject only to Permitted Priority Liens, the rights of certain creditors to the proceeds of the Committee Claims as further detailed herein, and, during the occurrence and continuance of an Event of Default or a default hereunder, to the payment of Priority Professional Expenses up to the Carve-Out Amount and UST/Clerk Fees, as provided in this Interim Order, the DIP Lenders and the Agents are hereby granted, effective immediately:  (i) a first priority, perfected security interest in, and lien, under section 364(c)(2) of the Bankruptcy Code, upon all of the Unencumbered Collateral, including Avoidance Actions, and (ii) a first priority, perfected security interest in and lien, under section 364(d)(1) of the Bankruptcy Code, upon all Secured Collateral (collectively, the "Post-Petition Liens");

(c)    no lien or security interest granted to the DIP Lenders or the Agents under this Final Order, including the Post-Petition Liens, shall (i) be subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code, or (ii) hereafter be subordinated to or made *pari passu* with any other lien or security interest under section 364(d) of the Bankruptcy Code or otherwise;

(d)    the liens and security interests arising hereunder shall be and hereby are fully perfected liens and security interests, such that no additional steps need be taken nor shall any documents be required to be filed with any governmental unit by the DIP Lenders or the Agents to perfect such interests; and

(e)    the Post-Petition Liens, Superpriority Claim and other rights and remedies granted to DIP Lenders and the Agents under this Final Order shall continue in this and in any

{A0066712.DOC 4}

superseding case or cases under the Bankruptcy Code, and such liens and security interests shall maintain their first priority as provided in this Final Order until all the DIP Obligations have been indefeasibly satisfied in full in cash and the Total Commitment is terminated.

12. Priority Professional Expenses, UST/Clerk Fees and Committee Claims Carve-Out. The payment of any amounts on account of the liens and security interests and the Superpriority Claim granted herein to the DIP Lenders and the Agents shall be subject and subordinate only to:

(a) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Court (collectively, the "UST/Clerk Fees");

(b) allowed Priority Professional Expenses to the extent that the amount entitled to priority under this clause 12(b) of this Final Order does not exceed $270,000 ($200,000 of such amount shall be applicable to the professional fees and expenses of counsel for the Debtors and $70,000 of such amount shall be applicable to the professional fees and expenses of counsel for the Committee) (the "Carve-Out Amount") outstanding in the aggregate at any time (inclusive of any holdbacks required by the Court); provided, however, that during the continuance of an Event of Default under the DIP Loan Documents or default by any of the Debtors or Guarantors in the performance or observance of any of their obligations under this Final Order or any Bankruptcy Court Order[4], the Debtors shall be permitted to pay Priority Professional Expenses allowed and payable under sections 327, 328, 330 and 331 of the Bankruptcy Code, as the same may be due and payable in accordance with any applicable order of the Court, provided,

---

[4]    To the extent that either the DIP Lenders or Agent intend to rely on any such default to trigger reliance on the Carve-Out Amount, they shall be required to provide written notice of such default to counsel to Debtors and the Committee.

14

however, that any and all such payments shall be first made from the application of pre-petition and post-petition retainers (the "Retainers") before any other funds are used for such payments, and such payments shall be applied against the Carve-Out Amount on a dollar-for-dollar basis after application of the Retainers; provided, however, that any such payments made from the Retainers shall not reduce the Carve-Out Amount. So long as no Event of Default under the DIP Loan Documents or a default by the Borrower or any Guarantor in any of their obligations under the Bankruptcy Court Orders shall have occurred and be continuing, the payment of administrative expenses allowed and payable under sections 327, 328, 330, 331 and 1103 of the Bankruptcy Code or otherwise shall not reduce the Carve-Out Amount;

(c)    Priority Professional Expenses shall also include any payments which are authorized to be made pursuant to any Court-approved procedure for monthly or other payment of administrative expenses; provided, that nothing contained herein shall (i) be construed to exempt those persons hereafter receiving interim compensation payments or reimbursement of expenses pursuant to any such Court-approved procedure for interim payments of administrative expenses from the applicable provisions of bankruptcy law, including the requirements that such compensation or reimbursement be allowed on a final basis after the filing of appropriate fee applications and (ii) be construed as consent to the allowance of any fees and expenses referred to above and shall not affect any right of the DIP Lenders or the Agents to object to the reasonableness of such amounts; provided, further, that Priority Professional Expenses shall not include, and proceeds of the DIP Loans shall not be used for the payment or reimbursement of, any fees or disbursements of the Debtors or any Committees or trustee appointed in these Chapter 11 Cases incurred in connection with the assertion and prosecution of, or joinder in, any claim, counterclaim, action, proceeding, application, motion, objection, defense or other

{A0066712.DOC 4}

contested matter, the purpose of which is to seek any order, judgment, determination or similar relief: (A) commencing or prosecuting any action asserting claims pursuant to sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code or other cause of action (whether arising under state law, the Bankruptcy Code or other federal law) against the DIP Lenders or the Agents with respect to the validity and extent of the Pre-Petition Obligations, the DIP Obligations or the validity, extent and priority of liens and security interests securing the Pre-Petition Obligations, the DIP Obligations of the Debtors; (B) invalidating, setting aside, avoiding or subordinating, in whole or in part, the DIP Lenders' and the Agents' liens or security interests in the Collateral; (C) preventing, hindering or delaying (whether, directly or indirectly) the DIP Lenders or the Agents in respect of their liens and security interests in the Collateral; and

(d)     recoveries from Avoidance Actions and other demands and causes of action ~~to~~ be *which may* brought by the Committee seeking recoveries of funds to the Estate (together with Avoidance Actions, the "Committee Claims") to be distributed only in satisfaction of the amount of the allowed general unsecured claims of Debtors' trade vendors (the "Vendors")(excluding any unsecured claims of Debtors' "Insiders" or "Affiliates", as those terms are defined in 11 U.S.C.§§101(2) and (31). In consideration for its consent to entry of this Final Order and provided that there is no Event of Default or a default hereunder, the Committee is hereby authorized to pursue (i) the Avoidance Actions; and (ii) such other demands and causes of actions as may be agreed to by the Committee, the Debtors and the DIP Lenders. No liens, claims, interests or priority status other than Permitted Priority Liens, Priority Professional Expenses (up to the Carve-Out Amount after an Event of Default or a default hereunder), proceeds of the Committee Claims as described herein, and UST/Clerk Fees, having a lien or administrative expense priority superior to or *pari passu* with those granted by this Final Order

16

{A0066712.DOC 4}

to the DIP Lenders or the Agents shall be granted while any portion of the DIP Obligations remains outstanding or any Commitment under the DIP Loan Agreement remains in effect without the written consent of the Required Lenders under the DIP Loan Agreement

13.    Limitation On Additional Surcharges.  No costs or expenses of administration shall be imposed against the DIP Lenders and/or the Collateral under Section 506© or otherwise and the Debtors hereby waive any rights to assert such claims. The DIP Lenders and the Agents shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

14.    Additional Perfection Measures.

(a)    The liens, security interests and priority granted to the DIP Lenders and the Agents pursuant to this Interim Order with respect to property of the Debtors' estates shall be perfected by operation of law upon entry of this Final Order by the Court.  Neither the Debtors nor the DIP Lenders or the Agents shall be required to enter into or to obtain landlord waivers, mortgagee waivers, bailee waivers, warehouseman waivers or other waiver or consent, or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including, trademark, copyright, trade name or patent assignment filings with the United State Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property), or obtain consents from any licensor or similarly situated party-in-interest, or take any other action in order to validate and to perfect the security interests and liens granted to the DIP Lenders and the Agents pursuant to this Final Order, provided, however, that, if the DIP Lenders in their sole discretion elect to file this Interim Order of record to evidence perfection of the DIP Lenders liens and security interests,

17

{A0066712.DOC 4}

then any recording office is hereby directed to accept a copy of this Final Order for such purpose;

(b)    If the DIP Lenders or the Agents, in their sole discretion, choose to obtain consents from any landlord, licensor or other party in interest, to file mortgages, financing statements, notices of lien or similar instruments, or to otherwise record or perfect such security interests and liens: (i) all such documents shall be deemed to have been recorded and filed as of the time and on the date of entry of this Final Order; and (ii) no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder;

(c)    In lieu of obtaining such consents or filing any such mortgages, financing statements, notices of lien or similar instruments, the DIP Lenders or the Agents may, at their sole discretion, choose to file a true and complete copy of this Final Order in any place at which any such instruments would or could be filed, together with a description of Collateral located within the geographic area covered by such place of filing, and such filing by the DIP Lenders or the Agents shall have the same effect as if such mortgages, deeds of trust, financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Final Order.

15.    <u>Application of Collateral Proceeds</u>.  Except as otherwise provided in this Final Order, the Debtors are hereby authorized and directed to remit to the DIP Lenders or the Agents, as the case may be, one-hundred percent (100%) of all collections on, and proceeds of, the Collateral, including all accounts receivable collections, proceeds of sales of inventory, fixed assets and any other assets, including sales in and outside the ordinary course of business, and all other cash or cash equivalents which shall at any time on or after the Petition Date come into the possession or control of the Debtors, or to which Debtors shall become entitled at any

18

time.  The automatic stay of section 362 of the Bankruptcy Code, to the extent applicable, is hereby modified to permit the DIP Lenders or the Agents to retain and apply all collections, remittances and proceeds of the Collateral in accordance with this Final Order and the DIP Loan Agreement to the DIP Obligations.  Notwithstanding any cash management agreements or any order entered continuing the Debtors' use of their current cash management system, no third party shall be entitled to use the proceeds of any Collateral in any accounts maintained or controlled by them, except as provided under the DIP Loan Documents and this Final Order, and any funds currently held, or received by any such third party after the Petition Date, shall be held by such third party until such time as the Debtors' cash management system has been modified to give effect to the DIP Loan Agreement.

16.     <u>Access to Information</u>.  Without limiting the rights of access and information afforded the DIP Lenders or the Agents under the DIP Loan Agreement, the Debtors shall permit representatives, agents and/or employees of the DIP Lenders and the Agents to have reasonable access to their premises and their records during normal business hours (without unreasonable interference with the proper operation of the Debtors' businesses) and shall cooperate, consult with, and provide to such persons all such non-privileged information as they may reasonably request.

17.     <u>Access to Collateral</u>.

(a)     Upon the occurrence of an Event of Default or violation of this Final Order, and subject to Paragraph 19 hereof, the DIP Lenders or Agents are authorized without further order of this Court, to enter upon any leased or licensed premises of any of the Debtors for the purpose of exercising any remedy with respect to Collateral located thereon and shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under such lease or license without

{A0066712.DOC 4}

interference from the landlords or licensors thereunder, <u>provided</u> that the DIP Lenders or Agents shall only pay base rent, or other obligations as required under the Bankruptcy Code, of the Debtors that first arises after the DIP Lenders' or Agents' written notice referenced above and that are payable during the period of such occupancy by the DIP Lenders or the Agents, as the case may be, calculated on a per diem basis. Nothing herein shall require the Debtors, DIP Lenders or Agents to assume any lease under section 365(a) of the Bankruptcy Code as a precondition to the rights afforded to the DIP Lenders in this paragraph. Nothing contained herein shall be deemed a waiver by the DIP Lenders or the Agents of their respective rights to claim that no relief from the automatic stay is needed in order to exercise any remedies with respect to an Event of Default or a violation of this Order;

(b)    Debtors shall give the DIP Lenders and the Agents, their representatives and consultants, reasonable access to the Debtors' facilities, offices, books and records during normal business hours to enable such parties, among other things, to inspect the Collateral.

18.    <u>Cash Management Systems</u>. The Debtors are authorized and directed to maintain their cash management system in a manner consistent with the DIP Loan Documents and this Final Order.

19.    <u>Automatic Stay Modified</u>. The automatic stay provisions of section 362 of the Code are, to the extent applicable, vacated and modified to the extent necessary so as to permit the Lenders:

(a)    whether or not an Event of Default or a default by the Debtors of any of their obligations under this Final Order has occurred, to require all cash, checks or other collections or proceeds from Collateral received by the Debtors to be deposited in accordance with the DIP Loan Documents, and to apply amounts deposited in any such account and other

20

{A0066712.DOC 4}

amounts paid to or received by the Lenders under the DIP Loan Agreement and the other DIP Loan Documents as provided in the DIP Loan Agreement;

   (b) upon the occurrence of an Event of Default or a default by the Debtors of any of their obligations under this Final Order, and subject to three (3) business days' prior written notice to the Debtors, their counsel, counsel for the Committee, and the United States Trustee, to exercise all rights and remedies provided for in the DIP Loan Agreement, the other DIP Loan Documents, this Final Order or under other applicable bankruptcy and nonbankruptcy law (including the right to setoff funds in accounts maintained by the Debtors with any Lenders to repay the DIP Obligations, as to which such prior written notice shall not be required) without requiring prior authorization of this Court in order to exercise such rights and remedies. The automatic stay of Code section 362(a), to the extent applicable, shall be deemed terminated as provided herein without the necessity of any further action by the Court in the event that the Debtors, any Committee and/or the United States Trustee have not obtained an order from this Court to the contrary within three (3) business days, after receiving such notice from the Lenders pursuant to this Final Order. The only issue that may be raised at any such hearing shall be whether, in fact, an Event of Default or default has occurred and is continuing. If the Court concludes an Event of Default occurred and is continuing, the automatic stay shall be modified.

   (c) this Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Final Order and relating to the application, re-imposition or continuance of the Code section 362(a) automatic stay, or other injunctive relief requested; and

   (d) Upon the occurrence and continuance of an Event of Default or a violation of this Final Order by any of the Debtors, the DIP Lenders and the Agents shall have no further

{A0066712.DOC 4}

obligation to provide financing under the DIP Loan Documents or this Final Order, and the DIP

Lenders and the Agents are hereby authorized to, without providing any prior notice thereof,

accelerate the obligations under the DIP Loan Documents, terminate any further commitment to

lend (the effectiveness of such commitment termination will be subject to the 3 business day

notice provided pursuant to paragraph 19(b) hereinabove) and/or charge interest at the default

rate set forth in the DIP Loan Agreement.  The DIP Lenders or the Agents shall provide the

Debtors and any Committee with prompt notice of any violation of this Final Order.

20.    No Responsible Person.  In making the decision to make DIP Loans and to extend

other financial accommodations to the Borrower under the DIP Loan Agreement and this Final

Order or to collect the indebtedness and obligations of the Debtors, the DIP Lenders and the

Agents shall not be deemed to be in control of the operations of the Debtors or to be acting as a

responsible person or owner or operator with respect to the operation or management of the

Debtors (as such terms, or any similar terms, are used in the United States Comprehensive

Environmental Response, Compensation and Liability Act, as amended, or any similar federal

or state statute).

21.    Successors and Assigns.  The DIP Loan Documents and the provisions of this

Final Order shall be binding upon the DIP Lenders, the Agents, the Debtors and their respective

successors and assigns, and shall inure to the benefit of the DIP Lenders, the Agents, and the

Debtors and their respective successors and assigns including, without limitation, any trustee,

responsible officer, estate administrator or representative, or similar person appointed in a case

for the Debtors under any chapter of the Bankruptcy Code.

22.    Binding Nature of Agreement.  Each of the DIP Loan Documents to which the

Debtors are and will become a party shall constitute legal, valid and binding obligations of the

22

Debtors, enforceable in accordance with their terms. The DIP Loan Documents have been or will be properly executed and delivered to the DIP Lenders by the Debtors. The rights, remedies, powers, privileges, liens and priorities of the DIP Lenders provided for in this Order and in any other DIP Loan Documents shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation order) or by any plan of reorganization or liquidation in these cases or in any subsequent case under the Bankruptcy Code unless and until the DIP Obligations have first been paid in full in cash, all DIP Obligations have been completely satisfied and the Total Commitment terminated in accordance with the DIP Loan Agreement.

23.    <u>Subsequent Reversal or Modification</u>. This Final Order is entered pursuant to sections 364 of the Bankruptcy Code, granting DIP Lenders all protections afforded by sections 364(e) of the Bankruptcy Code. If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, that action will not affect (a) the validity of any obligation, indebtedness or liability incurred hereunder by any of the Debtors to the DIP Lenders prior to the date of receipt of written notice to the DIP Lenders of the effective date of such action; or (b) the validity and enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Loan Documents or pursuant to this Final Order. Notwithstanding any such reversal, stay, modification or vacatur, any post-petition indebtedness, obligation or liability incurred by any of the Debtors to the DIP Lenders prior to written notice to the DIP Lenders of the effective date of such action shall be governed in all respects by the original provisions of this Final Order, and the DIP Lenders shall be entitled to all the rights, remedies, privileges and benefits granted herein and in the DIP Loan Documents with respect to all such indebtedness, obligation or liability.

{A0066712.DOC 4}

24.    No Waiver. This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lenders or the Agents may have to bring or be heard on any matter brought before this Court.

25.    Dismissal/Sale. No order dismissing or converting these chapter 11 cases under section 1112 of the Bankruptcy Code, or appointing a chapter 11 trustee or an examiner with expanded powers, shall be entered or motion filed by the Debtors for any such relief unless such order shall provide that the DIP Obligations shall be paid indefeasibly in full, in cash, and all DIP Obligations shall be completely satisfied and the Total Commitment terminated in accordance with the DIP Loan Agreement, or unless and until DIP Lenders shall have had a reasonable period of time to perfect all of their liens under applicable law prior to the entry thereof. No order providing for either the sale of the ownership of the stock of the Debtors or the sale of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code shall be entered by the Court unless, in connection and concurrently with any such event, the proceeds of such sale are sufficient, and applied, to indefeasibly pay in full all DIP Obligations and such DIP Obligations shall be indefeasibly paid in full in cash and all DIP Obligations completely satisfied and the Total Commitment will be terminated in accordance with the DIP Loan Agreement as part of such action, or the DIP Lenders expressly consent in writing to any such transaction or the entry of such an order by the Court or such transaction is expressly permitted in the DIP Loan Documents. The Debtors shall not sell either the stock of any of the Debtors or substantially all of the assets of any of the Debtors under section 363 of the Bankruptcy Code unless, in any such event, the DIP Lenders expressly consent in writing to any such transaction, such transaction is expressly permitted in the DIP Loan Documents or the terms of the sale expressly provide that the sale shall not be consummated unless the proceeds

24

of the sale are sufficient, and applied, to indefeasibly pay all DIP Obligations and such DIP Obligations shall be, upon the closing of such sale, indefeasibly in full in cash and completely satisfied, and the Total Commitment terminated in accordance with the DIP Loan Agreement or the DIP Lenders expressly consent in writing to any such transaction.  If an order dismissing any of these cases under sections 305 or 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide that (a) the liens, security interests and superpriority administrative expense status granted to the DIP Lenders hereunder and in the DIP Loan Documents, as the case may be, shall continue in full force and effect, shall remain binding on all parties in interest and shall maintain their priorities as provided in this Interim Order until all DIP Obligations shall have been paid in full in cash and the Total Commitment shall have been terminated in accordance with the DIP Loan Agreement, and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the liens, security interests and superpriority administrative expense status of the DIP Lenders, as the case may be.

26.    <u>Priority of Terms</u>.  To the extent of any conflict between or among the express terms or provisions of any of the DIP Loan Documents, the Motion, any other order of this Court, or any other agreements, the terms and provisions of this Final Order shall govern.

27.    <u>Financial Information</u>. The Committee shall be entitled to receive from the Debtors such financial information and reports as the Debtors supply to the DIP Lenders under the DIP Loan Documents.

28.    <u>Adequate Notice</u>. The notice given by the Debtors of the Final Hearing was given in accordance with Bankruptcy Rules 2002 and 4001(c)(2) and the local rules of this Court. Under the circumstances, no further notice of the request for the relief granted at the Final Hearing is required.  Debtors shall, on or before the close of business on June 10,2004, serve a

*copy of this request to be added to the service list.*

copy of this Final Order on i) the Office of the United States Trustee; (ii) the Securities and

Exchange Commission; (iii) the consolidated thirty (30) largest creditors of the Debtors; (iv) the

District Director of Internal Revenue for the Northern District of Illinois; and (v) the United

States Attorney for the Northern District of Illinois (collectively, the "Notice Parties").

29.   <u>Entry of Order; Effect</u>.  Unless an objection is raised by one or more of the Notice

Parties at a hearing to be noticed before this Court by one or more of the Notice Parties, this

Final Order shall take effect upon expiration of the tenth day following entry of this Final Order

on the Court's docket, and the Clerk of the Court is hereby directed to enter this Final Order on

the Court's docket in these cases.

30.   <u>Binding Effect of Order</u>.   The terms of this Final Order shall be binding on any

trustee appointed under Chapter 7 or Chapter 11 of the Bankruptcy Code.


Dated:  Chicago, Illinois
        June 9, 2004


_____
UNITED STATES BANKRUPTCY JUDGE


**JUN - 9 2004**

{A0066712.DOC 4}

Agreed As to Form and Substance:

**APPLIANCE CONTROLS GROUP HOLDINGS, INC. AND APPLIANCE CONTROLS GROUP, INC.,**

By: *Robert M. Rel*
One of their attorneys

Robert M. Fishman, Esq.
SHAW GUSSIS FISHMAN GLANTZ
   WOLFSON & TOWBIN LLC
321 N. Clark Street, Suite 800
Chicago, Illinois 60610

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By: *Faye Feinstein*
One of its attorneys

Faye Feinstein, Esq.
Quarles & Brady, LLC
500 West Madison St., Suite 3700
Chicago, IL 60661

**HILCO CAPITAL, LP, as Lender and Agent**

By:
One of its attorneys

Michael Eidelman, Esq.
Vedder Price Kaufman & Kammholz
222 N. LaSalle Street, Suite 2600
Chicago, Illinois 60601

27

{A0066712.DOC 4}

**Appliance Controls Group - Weekly Cash Flow**

| | Actual 5/3/2004 – 5/7/2004 | Actual 5/10/2004 – 5/14/2004 | Actual 5/17/2004 – 5/21/2004 | FCST 5/24/2004 – 5/28/2004 | FCST 5/31/2004 – 6/4/2004 | FCST 6/7/2004 – 6/11/2004 | FCST 6/14/2004 – 6/18/2004 | FCST 6/21/2004 – 6/25/2004 | FCST 6/28/2004 – 7/2/2004 | FCST 7/5/2004 – 7/9/2004 | FCST 7/12/2004 – 7/16/2004 | 11 WEEK TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Start:** | | | | | | | | | | | | |
| **Week End:** | | | | | | | | | | | | |
| Sales Per wk avg | 1,531,892 | 916,645 | 1,050,000 | 1,050,000 | 1,693,023 | 1,211,009 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,075,600 | 11,938,850 |
| | 236,338 | 183,329 | 218,605 | 210,000 | 217,480 | 248,465 | 248,000 | 240,000 | 228,200 | 183,500 | 215,000 | 248,161 |
| **Sources of Cash** | | | | | | | | | | | | |
| AR Acceleration | 1,024,349 | 863,283 | 1,586,339 | 916,645 | 1,693,023 | 1,283,045 | 900,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,015,000 | 11,400,839 |
| WIP Conversion/Sales Backlog | 446,955 | 100,000 | | | | | 50,000 | 187,000 | 232,000 | 200,000 | 200,000 | 710,000 |
| AR Acceleration | | | | | | | | | | | | 865,000 |
| **Total Receipts** | 1,471,304 | 963,283 | 1,588,339 | 916,645 | 1,693,023 | 1,283,045 | 950,000 | 1,187,000 | 1,232,600 | 1,260,000 | 1,215,000 | 12,975,639 |
| **Uses of Cash** | | | | | | | | | | | | |
| Vendor Payments | 711,455 | 581,674 | 803,828 | 584,000 | 559,000 | 564,200 | 572,000 | 572,000 | 577,200 | 585,000 | 585,000 | 6,675,357 |
| Vendor Payments - Prep | 190,000 | 190,000 | | | | | | | | | | 380,000 |
| Steel Price Increase Surcharge | | | | | | | | | | | | 380,000 |
| Mexico Support - Payroll | 76,000 | 75,179 | 73,795 | 78,000 | 78,000 | 78,000 | 79,000 | 79,000 | 79,000 | 79,000 | 79,000 | 854,874 |
| Mexico Support - Payroll Taxes | | 5,250 | 5,250 | 5,250 | 5,435 | 6,160 | 6,000 | 6,000 | 6,000 | | | 28,845 |
| Mexico Support - Utilities | 100,000 | 90,000 | 90,000 | | | | | | | | | 710,000 |
| Mexico Support - Real | 43,839 | | | | | | | 5,000 | 5,000 | | | 266,000 |
| Domestic Rent - Corp | 52,000 | 52,305 | | 52,305 | 52,305 | 48,000 | | 52,305 | 52,305 | | 45,000 | 143,939 |
| Domestic Rent - Tenn | 21,017 | 96,399 | | 6,170 | 5,100 | 7,413 | 6,365 | | | 5,000 | | 196,610 |
| Mexico Leases | | | | | | | | | | | | 150,389 |
| Insurance - Medical | | | | | | | | | | | | 310,893 |
| Insurance - Auto | | | | | | 140,000 | | | | | | 222,000 |
| Domestic Utilities - Team | | | | | | 8,000 | | | | | | 110,806 |
| Domestic Utilities - Corp/Pmc | | 893 | 30,606 | 82,000 | 50,000 | | | 90,000 | | 190,000 | 40,000 | 17,313 |
| Real Estate Taxes/Corp Move | | | 1,313 | | 20,750 | | | | | | | 50,000 |
| Outsourcing/Contract | 20,304 | 5,702 | 11,199 | 2,250 | 20,750 | 12,250 | -5,250 | 12,250 | 20,750 | 12,250 | 15,260 | 144,204 |
| Commissions | 5,673 | 5,673 | 10,797 | | 3,000 | 3,000 | | | | 3,000 | 3,000 | 6,000 |
| Employee Expenses | 23,485 | 5,673 | 10,797 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 207,955 |
| Capital Expenditures | | | | 31,000 | 31,000 | 31,000 | 31,000 | 31,000 | 31,000 | | | 82,000 |
| Domestic Payroll - 401K | 808 | 11,124 | 44,477 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 486,874 |
| Domestic Payroll - Temp | 42,177 | 44,477 | 44,477 | 45,000 | 46,500 | 45,000 | 45,000 | 145,500 | 145,500 | | | 86,239 |
| Domestic Payroll - Salary | 147,052 | 84,999 | 96,399 | 90,000 | 90,000 | 92,500 | 92,500 | 92,500 | 92,500 | 92,500 | 92,500 | 985,839 |
| Domestic - Other | 52,000 | 43,839 | | | | | | | | | 1,000 | 58,902 |
| Mexico Support - Income Taxes | | 18,794 | 19,814 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 243,625 |
| Mexico Support - Employee/Other | | 82,975 | | | | | | | | | | 1,746 |
| Domestic Leases | 11,203 | 4,806 | 4,029 | 3,977 | 1,315 | | 431 | 5,000 | 97,000 | 5,000 | 5,000 | 155,882 |
| Domestic Rent - Corp | 16,875 | 16,875 | 50,000 | 50,000 | | | 13,000 | | 16,875 | | | 62,000 |
| Domestic Service - Internet Only | 88,418 | 67,043 | | 67,041 | | | | 111,425 | | | | 313,928 |
| **Total Other Uses of Cash** | 1,465,835 | 1,160,018 | 1,461,369 | 1,171,477 | 1,170,616 | 1,033,523 | 1,208,066 | 966,759 | 1,373,555 | 1,169,750 | 1,076,250 | 13,117,208 |
| **Other Uses of Cash** | | | | | | | | | | | | |
| Debt Service - Amortization | 75,000 | | 25,000 | 50,000 | 25,000 | 25,000 | 68,000 | 30,000 | | | | 75,000 |
| Credit/Debtor Legal Fees/Retainer | | | 27,196 | | | | 50,000 | | | 50,000 | | 50,000 |
| Professional Fees (excl. CRP) | | | 62,936 | | | | | | | | | 146,204 |
| CRP | 121,401 | 69,139 | | | | | | | | | | 683,176 |
| Signing/Stay Bonus | | | | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | |
| Hilco Overadvance | 56,399 | | 157,096 | | | | | | 20,000 | | | |
| Lender Fees and expenses | 232,769 | 271,927 | | 165,000 | 80,000 | 149,522 | 171,000 | 85,000 | 75,000 | 55,000 | 195,000 | 233,484 |
| **Total Other Use of Cash** | (248,330) | (375,874) | (144,958) | (254,831) | (77,593) | 228,522 | (258,066) | 320,250 | (141,955) | 36,250 | 33,750 | (1,339,946) |
| **Net Cash Flow** | 4,469 | (316,735) | 126,970 | (254,831) | (77,593) | 228,522 | (258,066) | 320,250 | (141,955) | 91,250 | 138,750 | (137,509) |
| **Operating Cash Flow** | | | | | | | | | | | | |
| **Revolver** | | | | | | | | | | | | |
| Operating Balance | 3,724,549 | 3,315,880 | 3,640,754 | 4,532,166 | 4,591,998 | 5,000,066 | 5,000,066 | 5,429,134 | 5,193,884 | 5,410,439 | 5,374,189 | 75,000 |
| Borrowing | 1,719,834 | 1,239,157 | 1,733,297 | 1,276,477 | 1,250,616 | 1,113,523 | 1,379,008 | 961,750 | 1,448,555 | 1,183,750 | 1,181,260 | 221,000 |
| Repayments | (1,471,304) | (863,283) | (1,588,339) | (916,645) | (1,093,023) | (1,263,045) | (950,000) | (1,187,000) | (1,232,000) | (1,200,000) | (1,215,000) | 127,196 |
| Hilco Overadvance | (657,000) | (51,000) | 848,455 | | | | | | | | | 683,176 |
| Ending Balance | 3,315,880 | 3,640,754 | 4,532,166 | 4,591,998 | 5,149,561 | 5,000,066 | 5,429,134 | 5,193,864 | 5,410,439 | 5,374,189 | 5,340,431 | 233,484 |
| Current GE/Fortress Availability | 70,258 | (338,673) | (12,615) | (212,581) | (406,328) | (288,574) | (536,809) | (391,518) | (884,341) | (824,742) | (853,291) | (1,477,435) |
| Maximum Hilco Overadvance | 851,000 | 800,000 | 800,000 | 919,680 | 919,680 | 919,680 | 919,680 | 919,680 | 919,680 | 919,680 | 919,680 | 919,680 |
| Net Availability | | | 507,065 | 707,091 | 513,269 | 639,006 | 382,871 | 528,164 | 235,339 | 94,938 | 66,389 | |
| Cash Deposits & Prepaid Inventory | 1,094,500 | 1,094,500 | 1,094,500 | 1,094,500 | 1,094,500 | 1,094,500 | 1,094,500 | 1,094,500 | 1,094,500 | 1,094,500 | 1,094,500 | |
| Availability with 50% of Prepaids | 1,454,315 | | 1,454,315 | 1,254,341 | 1,060,616 | 1,186,256 | 930,121 | 1,075,414 | 782,589 | 642,168 | 613,639 | |

Hilco Capital

Borrowing Base Detail

| | Actual | Actual | Actual | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Start: | 5/3/2004 | 5/10/2004 | 5/17/2004 | 5/24/2004 | 5/31/2004 | 6/7/2004 | 6/14/2004 | 6/21/2004 | 6/28/2004 | 7/5/2004 | 7/12/2004 |
| Week End: | 5/7/2004 | 5/14/2004 | 5/21/2004 | 5/28/2004 | 6/4/2004 | 6/11/2004 | 6/18/2004 | 6/25/2004 | 7/2/2004 | 7/9/2004 | 7/16/2004 |
| **Accounts Receivable** | | | | | | | | | | | |
| *Consolidated* | | | | | | | | | | | |
| Opening Balance | 6,730,683 | 6,219,848 | 6,271,246 | 5,800,767 | 5,934,122 | 5,828,099 | 5,897,054 | 6,147,054 | 6,160,054 | 6,974,054 | 5,841,554 |
| Sales | 1,057,459 | 940,123 | 1,149,432 | 1,050,000 | 1,087,000 | 1,232,000 | 1,200,000 | 1,200,000 | 1,146,000 | 967,500 | 1,075,000 |
| Other Additions | | | | | | | | | | | |
| Collections | (1,568,294) | (888,725) | (1,619,911) | (916,645) | (1,093,023) | (1,000,000) | (950,000) | (1,187,000) | (1,232,000) | (1,200,000) | (1,215,000) |
| Other Reductions | 0 | 0 | 0 | 0 | 0 | (263,045) | | | | | |
| Ending Balance | 6,219,848 | 6,271,246 | 5,800,767 | 5,934,122 | 5,828,099 | 5,897,054 | 6,147,054 | 6,160,054 | 6,074,054 | 5,841,554 | 5,701,554 |
| Ineligible | 2,135,309 | 2,388,246 | 2,046,793 | 1,999,319 | 1,997,271 | 1,985,716 | 2,071,716 | 2,076,136 | 2,046,896 | 1,967,846 | 1,920,246 |
| Total Eligible AR | 4,084,539 | 3,903,050 | 3,753,974 | 3,934,803 | 3,930,828 | 3,910,338 | 4,075,338 | 4,083,918 | 4,027,158 | 3,873,708 | 3,781,308 |
| Advance Rate | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% |
| Avail Domestic AR | 3,469,308 | 3,317,350 | 3,190,878 | 3,344,583 | 3,341,204 | 3,323,788 | 3,464,038 | 3,471,331 | 3,423,085 | 3,292,652 | 3,214,112 |
| *Mexico* | | | | | | | | | | | |
| Opening Balance | 1,377,436 | 1,437,629 | 1,685,031 | 1,383,978 | 1,399,319 | 1,397,271 | 1,386,716 | 1,471,716 | 1,476,136 | 1,448,896 | 1,367,846 |
| Sales | 326,655 | 227,402 | 201,136 | 357,000 | 369,580 | 418,880 | 408,000 | 408,000 | 389,640 | 328,950 | 365,500 |
| Other Additions | | | | | | | | | | | |
| Collections | (266,462) | 0 | (512,189) | (311,659) | (371,628) | (340,000) | (323,000) | (403,580) | (418,880) | (408,000) | (413,100) |
| Other Reductions | 0 | 0 | 0 | 0 | 0 | (89,435) | 0 | 0 | 0 | 0 | 0 |
| Ending Balance | 1,437,629 | 1,685,031 | 1,353,978 | 1,399,319 | 1,397,271 | 1,386,716 | 1,471,716 | 1,476,136 | 1,446,896 | 1,367,846 | 1,320,246 |
| Ineligible | 208,426 | 208,994 | 198,882 | 203,217 | 203,608 | 203,769 | 203,958 | 204,525 | 203,968 | 203,249 | 203,759 |
| Total Eligible AR | 1,229,203 | 1,456,037 | 1,154,296 | 1,196,101 | 1,193,663 | 1,182,937 | 1,267,758 | 1,271,611 | 1,242,928 | 1,164,596 | 1,116,486 |
| Advance Rate | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% |
| Avail Mexico AR | 1,044,823 | 1,237,631 | 981,152 | 1,016,686 | 1,014,614 | 1,005,488 | 1,077,594 | 1,080,869 | 1,056,489 | 989,907 | 949,013 |
| **Total Avail AR** | 4,514,131 | 4,555,181 | 4,172,030 | 4,361,269 | 4,355,818 | 4,329,275 | 4,541,632 | 4,552,200 | 4,479,573 | 4,282,558 | 4,163,126 |
| **Inventory** | | | | | | | | | | | |
| *Consolidated* | | | | | | | | | | | |
| Beg. Raw Materials | 4,379,906 | 4,501,584 | 4,558,608 | 4,578,634 | 4,578,634 | 4,560,869 | 4,562,384 | 4,562,384 | 4,564,484 | 4,587,634 | 4,567,634 |
| Purchases | 0 | 0 | 0 | 210,000 | 196,875 | 225,750 | 225,750 | 227,850 | 231,000 | 231,000 | 233,100 |
| Purchases-Pop | 0 | 0 | 0 | 32,000 | 27,360 | 0 | 0 | 0 | 0 | 0 | 0 |
| Conversions | 0 | 0 | 0 | (210,000) | (210,000) | (196,875) | (225,750) | (225,750) | (227,850) | (231,000) | (231,000) |
| Conversions-Pop | 0 | 0 | 0 | (32,000) | (32,000) | (27,360) | 0 | 0 | 0 | 0 | 0 |
| Ending Raw Materials | 4,501,584 | 4,558,608 | 4,578,634 | 4,578,634 | 4,560,869 | 4,562,384 | 4,562,384 | 4,564,484 | 4,567,634 | 4,587,634 | 4,569,734 |
| Beg. WIP | 3,359,943 | 3,436,570 | 3,453,282 | 3,480,204 | 3,389,418 | 3,304,418 | 3,197,113 | 3,203,733 | 3,203,733 | 3,206,463 | 3,210,558 |
| 30% Purchases | 0 | 0 | 0 | 273,000 | 273,000 | 255,938 | 293,475 | 293,475 | 296,205 | 300,300 | 300,300 |
| 13% Purchases-Pop | 0 | 0 | 0 | 38,160 | 38,160 | 30,917 | 0 | 0 | 0 | 0 | 0 |
| Conversions | 0 | 0 | 0 | (273,000) | (273,000) | (255,938) | (293,475) | (293,475) | (296,205) | (300,300) | |
| Conversions-Pop | 0 | 0 | 0 | (126,946) | (121,160) | (121,180) | (30,917) | | | | |
| Ending WIP | 3,436,570 | 3,453,282 | 3,480,204 | 3,389,418 | 3,304,418 | 3,197,113 | 3,203,733 | 3,203,733 | 3,206,463 | 3,210,558 | 3,210,558 |
| Beg. Finished Goods | 2,382,161 | 2,533,307 | 2,427,310 | 2,479,597 | 2,480,736 | 2,466,828 | 2,460,288 | 2,329,716 | 2,250,289 | 2,248,483 | 2,250,062 |
| 24% Purchases | 0 | 0 | 0 | 338,520 | 338,520 | 338,520 | 317,363 | 363,909 | 363,909 | 367,294 | 372,372 |
| 14% Purchases-Pop | 0 | 0 | 0 | 144,716 | 138,122 | 138,122 | 36,245 | 0 | 0 | 0 | 0 |
| 62% Conversions | 0 | 0 | 0 | (340,200) | (340,200) | (340,200) | (340,200) | (318,938) | (365,715) | (365,715) | (369,117) |
| 44% Conversions-Pop | 0 | 0 | 0 | (142,289) | (150,353) | (142,983) | (142,980) | (124,396) | | | |
| Ending Finished Goods | 2,533,307 | 2,427,310 | 2,479,597 | 2,480,736 | 2,466,828 | 2,460,288 | 2,329,716 | 2,250,289 | 2,248,483 | 2,250,062 | 2,253,317 |
| Total Eligible Inventory | 7,034,991 | 6,985,918 | 7,058,821 | 7,059,370 | 7,027,695 | 7,022,672 | 6,892,100 | 6,814,773 | 6,816,117 | 6,817,696 | 6,823,061 |
| Ineligible | 4,236,319 | 4,030,856 | 4,196,088 | 4,251,470 | 4,216,089 | 4,173,756 | 4,164,678 | 4,181,322 | 4,173,465 | 4,193,838 | 4,193,517 |
| Total Eligible | 2,798,672 | 2,955,062 | 2,862,533 | 2,807,901 | 2,811,606 | 2,848,916 | 2,727,422 | 2,633,451 | 2,642,651 | 2,623,858 | 2,629,534 |
| 50% Avail Domestic Inv | 1,399,336 | 1,477,531 | 1,431,267 | 1,403,950 | 1,405,803 | 1,424,458 | 1,363,711 | 1,316,725 | 1,321,326 | 1,311,929 | 1,314,767 |
| *Mexico* | | | | | | | | | | | |
| Beg. Raw Materials | 2,990,189 | 3,029,485 | 3,057,535 | 3,040,139 | 3,040,139 | 3,022,374 | 3,023,889 | 3,023,889 | 3,025,989 | 3,029,139 | 3,029,139 |
| Purchases | 0 | 0 | 0 | 210,000 | 196,875 | 225,750 | 225,750 | 227,850 | 231,000 | 231,000 | 233,100 |
| Purchases-Pop | 0 | 0 | 0 | 32,000 | 27,360 | 0 | 0 | 0 | 0 | 0 | 0 |
| Conversions | 0 | 0 | 0 | (210,000) | (210,000) | (196,875) | (225,750) | (225,750) | (227,850) | (231,000) | (231,000) |
| Conversions-Pop | 0 | 0 | 0 | (32,000) | (32,000) | (27,360) | 0 | 0 | 0 | 0 | 0 |
| Ending Raw Materials | 3,029,485 | 3,057,535 | 3,040,139 | 3,040,139 | 3,022,374 | 3,023,889 | 3,023,889 | 3,025,989 | 3,029,139 | 3,029,139 | 3,031,239 |
| Beg. WIP | 1,299,184 | 1,269,692 | 1,264,515 | 1,249,973 | 1,244,085 | 1,244,085 | 1,221,687 | 1,227,760 | 1,227,760 | 1,230,490 | 1,234,585 |
| 30% Purchases | 0 | 0 | 0 | 273,000 | 273,000 | 255,938 | 293,475 | 293,475 | 296,205 | 300,300 | 300,300 |
| 15% Purchases-Pop | 0 | 0 | 0 | 38,900 | 36,800 | 31,464 | 0 | 0 | 0 | 0 | 0 |
| Conversions | 0 | 0 | 0 | (273,000) | (273,000) | (273,000) | (255,938) | (293,475) | (293,475) | (296,205) | (300,300) |
| Conversions-Pop | 0 | 0 | 0 | (42,888) | (56,800) | (36,800) | (31,464) | | | | |
| Ending WIP | 1,269,692 | 1,264,515 | 1,249,973 | 1,244,085 | 1,244,085 | 1,221,687 | 1,227,760 | 1,227,760 | 1,230,490 | 1,234,585 | 1,234,585 |
| Beg. Finished Goods | 781,385 | 878,723 | 689,845 | 814,733 | 814,070 | 797,152 | 788,528 | 762,236 | 752,884 | 751,078 | 752,658 |
| 24% Purchases | 0 | 0 | 0 | 338,520 | 338,520 | 338,520 | 317,369 | 363,909 | 363,909 | 367,294 | 372,372 |
| 22% Purchases-Pop | 0 | 0 | 0 | 52,079 | 44,896 | 44,896 | 38,388 | 0 | 0 | 0 | 0 |
| 62% Conversions | 0 | 0 | 0 | (340,200) | (340,200) | (340,200) | (340,200) | (318,938) | (365,715) | (365,715) | (369,117) |
| 62% Conversions-Pop | 0 | 0 | 0 | (51,082) | (60,134) | (51,840) | (51,840) | (44,323) | | | |
| Ending Finished Goods | 878,723 | 689,845 | 814,733 | 814,070 | 797,152 | 788,528 | 752,236 | 752,884 | 751,078 | 752,658 | 755,913 |
| Total Eligible Inventory | 5,178,900 | 5,011,895 | 5,104,845 | 5,098,294 | 5,063,611 | 5,034,103 | 5,003,885 | 5,006,633 | 5,010,707 | 5,016,382 | 5,021,737 |
| Ineligible | 719,799 | 680,935 | 734,681 | 844,085 | 844,085 | 821,867 | 827,760 | 827,760 | 830,480 | 834,585 | 834,585 |
| Total Eligible | 4,459,101 | 4,330,960 | 4,370,164 | 4,254,209 | 4,219,526 | 4,212,417 | 4,176,125 | 4,178,873 | 4,180,217 | 4,181,797 | 4,187,152 |
| 25% Avail Max Inv | 1,114,025 | 1,082,740 | 1,092,541 | 1,063,552 | 1,054,881 | 1,053,104 | 1,044,031 | 1,044,718 | 1,045,054 | 1,045,449 | 1,046,788 |
| **Total Available Inventory** | 2,513,361 | 2,560,271 | 2,523,808 | 2,467,503 | 2,460,685 | 2,477,562 | 2,407,742 | 2,361,444 | 2,366,380 | 2,367,378 | 2,361,555 |

Borrowing Base Detail

| | Actual 5/3/2004 5/7/2004 | Actual 5/10/2004 5/14/2004 | Actual 5/17/2004 5/21/2004 | FCST 5/24/2004 5/28/2004 | FCST 5/31/2004 6/4/2004 | FCST 6/7/2004 6/11/2004 | FCST 6/14/2004 6/18/2004 | FCST 6/21/2004 6/25/2004 | FCST 6/28/2004 7/2/2004 | FCST 7/5/2004 7/9/2004 | FCST 7/12/2004 7/16/2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **OLV Machinery & Equip** | | | | | | | | | | | |
| *Domestic* | | | | | | | | | | | |
| Value | 1,480,000 | 1,480,000 | 1,480,000 | 1,480,000 | 1,480,000 | 1,480,000 | 1,480,000 | 1,480,000 | 1,480,000 | 1,480,000 | 1,480,000 |
| Advance Rate | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% |
| Avail Mach & Equip | 1,258,000 | 1,258,000 | 1,258,000 | 1,258,000 | 1,258,000 | 1,258,000 | 1,258,000 | 1,258,000 | 1,258,000 | 1,258,000 | 1,258,000 |
| *Mexico* | | | | | | | | | | | |
| Value | 946,000 | 946,000 | 946,000 | 946,000 | 946,000 | 946,000 | 946,000 | 946,000 | 946,000 | 946,000 | 946,000 |
| Advance Rate | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% |
| Avail Mach & Equip | 804,100 | 804,100 | 804,100 | 804,100 | 804,100 | 804,100 | 804,100 | 804,100 | 804,100 | 804,100 | 804,100 |
| Total Avail Mach & Equip | 2,062,100 | 2,062,100 | 2,062,100 | 2,062,100 | 2,062,100 | 2,062,100 | 2,062,100 | 2,062,100 | 2,062,100 | 2,062,100 | 2,062,100 |
| **FMV Real Estate** | | | | | | | | | | | |
| Value | 1,050,000 | 1,050,000 | 1,050,000 | 1,050,000 | 1,050,000 | 1,050,000 | 1,050,000 | 1,050,000 | 1,050,000 | 1,050,000 | 1,050,000 |
| Advance Rate | 70% | 70% | 70% | 70% | 70% | 70% | 70% | 70% | 70% | 70% | 70% |
| Total Avail Real Estate | 735,000 | 735,000 | 735,000 | 735,000 | 735,000 | 735,000 | 735,000 | 735,000 | 735,000 | 735,000 | 735,000 |
| **Total Avail. Collateral** | 9,824,592 | 9,912,552 | 9,492,937 | 9,825,871 | 9,613,602 | 9,603,938 | 9,746,474 | 9,710,744 | 9,643,054 | 9,437,037 | 9,321,781 |
| *Change* | (295,405) | 87,961 | (419,615) | 132,834 | (12,269) | (9,905) | 142,536 | (35,730) | (67,690) | (206,017) | (115,256) |
| Current Outstandings | 9,358,475 | 9,683,349 | 10,963,595 | 11,323,427 | 11,481,020 | 11,331,497 | 11,760,563 | 11,525,313 | 11,741,868 | 11,705,618 | 11,671,868 |
| Covenant Reset Reserve | 1,500,000 | | | | | | | | | | |
| **Total Hilco Availability** | (1,033,883) | 229,204 | (1,470,658) | (1,497,555) | (1,867,418) | (1,727,560) | (2,014,090) | (1,814,570) | (2,098,814) | (2,268,581) | (2,350,087) |

Balance Change Group

Borrowing Base Detail

| Fortress Capital | Week Start:<br>Week End: | Actual<br>5/3/2004<br>5/7/2004 | Actual<br>5/10/2004<br>5/14/2004 | Actual<br>5/17/2004<br>5/21/2004 | FCST<br>5/24/2004<br>5/28/2004 | FCST<br>5/31/2004<br>6/4/2004 | FCST<br>6/7/2004<br>6/11/2004 | FCST<br>6/14/2004<br>6/18/2004 | FCST<br>6/21/2004<br>6/28/2004 | FCST<br>6/28/2004<br>7/2/2004 | FCST<br>7/5/2004<br>7/9/2004 | FCST<br>7/12/2004<br>7/16/2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Accounts Receivable** | | | | | | | | | | | | |
| Opening Balance | | 6,730,663 | 6,219,848 | 6,271,248 | 5,800,767 | 5,934,122 | 5,928,099 | 5,897,054 | 6,147,054 | 6,160,054 | 6,074,054 | 5,841,554 |
| Sales | | 1,057,459 | 940,123 | 1,149,432 | 1,050,000 | 1,087,000 | 1,232,000 | 1,200,000 | 1,200,000 | 1,148,000 | 987,500 | 1,075,000 |
| Other Additions | | | | | | | | | | | | |
| Collections | | (1,568,294) | (888,725) | (1,619,911) | (916,645) | (1,093,023) | (1,000,000) | (950,000) | (1,187,000) | (1,232,000) | (1,200,000) | (1,215,000) |
| Other Reductions | | 0 | 0 | 0 | 0 | 0 | (263,045) | 0 | 0 | 0 | 0 | 0 |
| Ending Balance | | 6,219,848 | 6,271,248 | 5,800,767 | 5,934,122 | 5,928,099 | 5,897,054 | 6,147,054 | 6,160,054 | 6,074,054 | 5,841,554 | 5,701,554 |
| Ineligible | | 2,125,919 | 2,368,248 | 2,049,844 | 1,814,324 | 1,852,586 | 1,850,858 | 1,841,950 | 1,913,679 | 1,917,409 | 1,892,734 | 1,826,027 |
| Total Eligible AR | | 4,093,929 | 3,903,000 | 3,750,923 | 4,119,797 | 4,075,513 | 4,046,196 | 4,305,104 | 4,246,375 | 4,156,645 | 3,948,820 | 3,875,527 |
| Advance Rate | | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% |
| Total Avail AR | | 3,479,840 | 3,317,550 | 3,188,285 | 3,501,828 | 3,464,186 | 3,439,267 | 3,659,338 | 3,609,419 | 3,533,148 | 3,356,497 | 3,294,198 |
| **Inventory** | | | | | | | | | | | | |
| *Domestic* | | | | | | | | | | | | |
| Beg. Raw Materials | | 4,379,908 | 4,501,684 | 4,558,608 | 4,578,634 | 4,578,634 | 4,560,869 | 4,562,384 | 4,562,384 | 4,564,484 | 4,567,634 | 4,567,634 |
| Purchases | | 0 | 0 | 0 | 210,000 | 196,875 | 225,750 | 225,750 | 227,850 | 231,000 | 231,000 | 233,100 |
| Purchases-Pop | | 0 | 0 | 32,000 | 27,360 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Conversions | | 0 | 0 | 0 | (210,000) | (210,000) | (196,875) | (225,750) | (225,750) | (227,850) | (231,000) | (231,000) |
| Conversions-Pop | | 0 | 0 | 0 | (32,000) | (32,000) | (27,380) | 0 | 0 | 0 | 0 | 0 |
| Ending Raw Materials | | 4,501,684 | 4,558,608 | 4,578,634 | 4,578,634 | 4,560,869 | 4,562,384 | 4,562,384 | 4,564,484 | 4,567,634 | 4,567,634 | 4,569,734 |
| Beg. WIP | | 3,359,943 | 3,436,570 | 3,453,282 | 3,480,204 | 3,389,418 | 3,304,418 | 3,197,113 | 3,203,733 | 3,203,733 | 3,206,463 | 3,210,558 |
| 13% Purchases | | 0 | 0 | 0 | 273,000 | 273,000 | 255,938 | 293,475 | 293,475 | 296,205 | 300,300 | 300,300 |
| Purchases-Pop | | 0 | 0 | 0 | 273,000 | 273,000 | 255,938 | 293,475 | 293,475 | 296,205 | 300,300 | 300,300 |
| Conversions | | 0 | 0 | 36,160 | 36,160 | 30,917 | 0 | 0 | 0 | 0 | 0 | 0 |
| Conversions | | 0 | 0 | 0 | (273,000) | (273,000) | (255,938) | (293,475) | (293,475) | (296,205) | (300,300) | 0 |
| Conversions-Pop | | 0 | 0 | 0 | (126,946) | (121,160) | (121,160) | (30,917) | 0 | 0 | 0 | 0 |
| Ending WIP | | 3,436,570 | 3,453,282 | 3,480,204 | 3,389,418 | 3,304,418 | 3,197,113 | 3,203,733 | 3,203,733 | 3,206,463 | 3,210,558 | 3,210,558 |
| Beg. Finished Goods | | 2,382,161 | 2,533,307 | 2,427,310 | 2,479,987 | 2,480,736 | 2,466,826 | 2,460,288 | 2,329,716 | 2,250,289 | 2,248,483 | 2,250,062 |
| 12% Purchases | | 0 | 0 | 0 | 338,520 | 338,520 | 338,520 | 317,363 | 363,909 | 363,909 | 367,294 | 372,372 |
| Purchases-Pop | | 0 | 0 | 144,716 | 138,122 | 138,122 | 138,122 | 35,245 | 0 | 0 | 0 | 0 |
| 26% Conversions | | 0 | 0 | 0 | (340,200) | (340,200) | (340,200) | (340,200) | (318,936) | (365,716) | (365,715) | (369,117) |
| Conversions-Pop | | 0 | 0 | 0 | (142,289) | (150,353) | (142,980) | (142,980) | (124,398) | 0 | 0 | 0 |
| Ending Finished Goods | | 2,533,307 | 2,427,310 | 2,479,987 | 2,480,736 | 2,466,826 | 2,460,288 | 2,329,716 | 2,250,289 | 2,248,483 | 2,250,062 | 2,253,317 |
| Total Eligible Inventory | | 7,034,991 | 6,885,918 | 7,058,621 | 7,059,370 | 7,027,695 | 7,022,672 | 6,892,100 | 6,814,773 | 6,816,117 | 6,817,698 | 6,823,051 |
| Ineligible | | 4,222,319 | 4,016,856 | 4,196,088 | 4,504,209 | 4,469,526 | 4,462,417 | 4,426,125 | 4,428,873 | 4,430,217 | 4,431,797 | 4,437,152 |
| Total Eligible | | 2,812,672 | 2,869,062 | 2,862,533 | 2,555,161 | 2,558,169 | 2,560,255 | 2,465,975 | 2,385,899 | 2,385,899 | 2,385,899 | 2,385,899 |
| 50% Avail Domestic Inv | | 1,406,336 | 1,484,531 | 1,431,267 | 1,277,581 | 1,279,085 | 1,280,128 | 1,232,987 | 1,192,950 | 1,192,950 | 1,192,950 | 1,192,950 |
| Term Loan Facility (offset) | | 202,075 | 202,075 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| Total Avail. Collateral | | 5,088,251 | 5,004,156 | 4,659,551 | 4,819,408 | 4,783,271 | 4,759,395 | 4,932,325 | 4,842,369 | 4,766,098 | 4,589,447 | 4,527,148 |
| Change | | (511,214) | (84,095) | (344,605) | 159,857 | (38,137) | (23,878) | 172,931 | (89,957) | (76,270) | (176,652) | (62,299) |
| Current Outstandings | | 3,517,985 | 3,842,829 | 4,672,186 | 5,031,998 | 5,189,591 | 5,040,068 | 5,469,134 | 5,233,884 | 5,450,439 | 5,414,189 | 5,380,439 |
| Covenant Reset Reserve | | 1,500,000 | 1,500,000 | | | | | | | | | |
| **Total Fortress Availability** | | 70,266 | (338,673) | (12,615) | (212,589) | (406,320) | (280,674) | (536,809) | (391,516) | (684,341) | (824,742) | (853,291) |